UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH DAKOTA
SOUTHERN DIVISION

| | |
|---|---|
| MATTHEW RODRIGUEZ, *Individually and as Special Administrator of the Estate of Kelley Rodriguez Estate of* Kelley Rodriguez, <br><br> Plaintiff, <br><br> vs. <br><br> JAMES VANIPEREN and HARMS OIL COMPANY, <br><br> Defendants. | 4:23-CV-04006-KES <br><br><br> ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFF'S PARTIAL MOTION FOR SUMMARY JUDGMENT; GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT; DENYING DEFENDANTS' MOTION TO STRIKE; DENYING PLAINTIFF'S REQUEST TO CERTIFY; GRANTING IN PART AND DENYING IN PART PLAINTIFF'S JUDICIAL NOTICE REQUEST; DENYING DEFENDANTS' MOTION FOR HEARING; DENYING PLAINTIFF'S MOTION TO SUPPLEMENT EVIDENTIARY RECORD |

This case centers around a tragic vehicle collision near Brookings, South

Dakota. *See* Docket 48 ¶¶ 1, 12. Defendant, James VanIperen,[1] an employee of

defendant, Harms Oil Co., drove a truck, crashed into Kelley Rodriguez's car

parked in the right-hand lane of I-29, and ultimately killed Kelley. Docket 61

¶¶ 15, 17 (not disputing that VanIperen collided into Kelley's vehicle), 21;

Docket 41-3 (showing Kelley's car in right-hand lane). Plaintiff, Matthew

---

[1] Defendants spell VanIperen inconsistently. *See, e.g.*, Docket 39 at 1
("VanIperen"); Docket 12 at 1 ("Van Iperen"). The court adopts the spelling in
the most recent filings, which appears to be VanIperen. *See* Docket 78 at 1.

Rodriguez, individually and as special administrator of the Estate of Kelley Rodriguez, sued VanIperen and Harms Oil, bringing survival and wrongful death claims. *See* Docket 6.[2]

Defendants move for summary judgment, arguing plaintiff is barred from recovery because Kelley was contributorily negligent and assumed the risk. *See* Docket 38; Docket 39 at 4-17. In the alternative, defendants move for summary judgment on plaintiff's survival claim (on different grounds) and for partial summary judgment on plaintiff's request for punitive damages with respect to plaintiff's wrongful death claim. *See* Docket 39 at 17-22. Defendants also move to strike various filings by plaintiff. *See* Docket 67. Additionally, defendants move for oral argument on the various issues in the case. Docket 62.[3]

Plaintiff opposes defendants' motion for summary judgment, and cross motions for partial summary judgment on the issue of defendants' affirmative defenses.[4] Docket 46; Docket 47. Plaintiff also opposes defendants' motion to

---

[2] The operative amended complaint does not expressly state a survival claim, but because defendants do not challenge the sufficiency of the pleading and instead attack the claim on its merits, the court construes the amended complaint as stating a survival claim under SDCL § 15-4-1.

[3] Defendants also move to stay all discovery on liability, or in the alternative, stay all discovery pertaining to defendant VanIperen. Docket 77. Defendants expressly state that this stay request does not apply to damages-related discovery or their pending motion for summary judgment. *See* Docket 78 at 1 n.1. The court will address defendants' motion to stay in a separate order.

[4] Plaintiff's initial motion is somewhat ambiguous regarding the claims on which he requests partial summary judgment. *See* Docket 46. In the initial motion, plaintiff states he seeks summary judgment "on Defendants' affirmative defenses of assumption of the risk and punitive damages . . . ." *Id.* Thus, construed alone, plaintiff does not expressly seek summary judgment on defendants' contributory negligence defense. *See id.* In his brief in support of

strike its filings, moves the court to take judicial notice of various documents, and moves the court to certify the issue of whether punitive damages are available in wrongful death claims to the South Dakota Supreme Court. *See* Docket 55; Docket 57; Docket 71. Defendants object to some, but not all, of plaintiff's request to take judicial notice of certain documents and opposes certification of the punitive damages issue to the South Dakota Supreme Court. *See* Docket 65; Docket 66. Finally, plaintiff also moves to supplement the evidentiary record pursuant to Rule 56(d)(3) in support of plaintiff's opposition to defendants' pending motion for summary judgment. Docket 79.[5]

After carefully considering the parties' submissions and arguments, the court finds oral argument unnecessary and thus denies defendants' request for oral argument. The court issues the following order:

---

his partial summary judgment request, however, plaintiff argues summary judgment is appropriate in favor of him on the issue of contributory negligence. *See* Docket 47 at 12-17. As it relates to punitive damages, plaintiff does not argue in briefing that the court should grant summary judgment in his favor on this matter, only that the court ought to certify the issue to the South Dakota Supreme Court or decide for itself that such damages are available in wrongful death actions. *See id.* at 17-30. In a later filing, plaintiff clarifies that he only seeks summary judgment on defendants' affirmative defenses of assumption of risk and contributory negligence, but not on punitive damages. *See* Docket 71 at 7 n.3. The court construes plaintiff's partial summary judgment motion accordingly, and only considers whether it should grant partial summary judgment in favor of plaintiff on defendants' affirmative defenses of assumption of the risk and contributory negligence.

[5] Plaintiff also moves to compel certain discovery. Docket 86. The court will address this motion in a separate order.

**FACTS[6]**

The undisputed facts are:

On November 15, 2022, Kelley Rodriguez rented a 2020 Chevy Equinox and began a trip from Lincoln, Nebraska to Fargo, North Dakota. Docket 61 ¶ 2 (not disputing that Kelley was headed towards Fargo, North Dakota). The Equinox's fuel tank was empty, so Kelley filled it with 13.831 gallons of fuel at a gas station near Gretna, Nebraska. *Id.* ¶ 3. On her way to Fargo, Kelley stopped somewhere (the parties disagree where specifically) to spend the night. *Id.* ¶ 4 (outlining disagreement but not disputing Kelley stopped somewhere).

The next day, on November 16, 2022, Kelley headed north on I-29, and drove toward Brookings, South Dakota. *See* Docket 48 ¶ 1. Kelley's car stopped working (for reasons the parties dispute). *See* Docket 61 ¶ 7 (not disputing Kelley's car was stationary in the right northbound lane of I-29 but disputing whether the Equinox ran out of gas or just stalled). Kelley's car was in the right northbound lane of I-29 and was not on the safety shoulder. *See* Docket 48 ¶ 5 (disputing only the relevance and reasons for being in the lane rather than the shoulder). The Equinox's tires, however, were pointed towards the safety shoulder, and Kelley activated the Equinox's hazard lights. *See* Docket 41-3

---

[6] At times, both parties object to the opposing side's statements of undisputed fact on the grounds that the fact at issue is immaterial. *See, e.g.*, Docket 48 ¶ 7; Docket 61 ¶ 23. Unless otherwise explicitly stated, if the court includes the fact in this opinion, the court overrules these immateriality objections because Rule 401 is a low bar, and the court finds these facts are directly probative on the issue of contributory negligence and assumption of risk. *See Rembrandt Enter., Inc. v. Tecno Poultry Equip, SpA*, 2023 WL 9004917, at *6 (N.D. Iowa Dec. 28, 2023) (describing the bar for relevance as posing a "low hurdle" and collecting cases doing the same).

(dash camera footage); *see also* Docket 41-1 (sound of hazards in background and Kelley saying she has her hazards on); Docket 41-2 (sound of hazards).

Kelley remained in her car and called AAA. *See* Docket 41-1 (first AAA call); Docket 41-2 (second AAA call). The first AAA agent Kelley spoke to asked Kelley, "Are you in a safe location?" to which Kelley replied, "Um, I'm not really sure if I'm in a safe location. I'm just like . . . I'm on the interstate, like in the first lane. I couldn't . . . I'm driving a rental car and it told me that I had backup fuel but like apparently I didn't and the car just like stopped." Docket 41-1. A moment later, the same AAA agent asked, "Are you in such a situation that you may need to call the police, because of the traffic?" *Id.* Kelley responded, "I mean I don't think so, I have my hazards lights on . . . But the heats off in the car and I only have like on a short sleeved shirt because I'm going to a business meeting, so . . . I didn't plan on spending any time out of the car, ya know?" *Id.* The AAA agent replied, "Okay. Just want to make sure if you are in a dangerous situation, think about if you need to call the police or not so they can help you out." *Id.* Kelley said, "Okay." *Id.* The agent then transferred Kelley to a different AAA associate. *Id.*

After the transfer, the second AAA representative asked, "Are you in a safe location?" Docket 41-2. Kelley stated, "I am . . . like I'm kinda in a safe location, I'm in the right lane of I-29 Interstate and I just need somebody to come here quickly so I can . . . so I can get gas in my car and not like freeze." *Id.* Kelley also stated:

5

> I'm in a rental car, and it told me that I had like this thing called fuel reserve . . . [i]t said that my fuel was low, but then it said I had like 20 miles of fuel for reserves so I was like alright well I'm a mile from a gas station I should be fine, but then the car just stopped.

*Id.* Shortly afterwards, there is a faint crash noise. *Id.* The AAA agent then asked, "And you say you need gas? You want us to come bring you gas? Hello? Hello? Hello? Hello? Hello?" *Id.*

Kelley did not call 911 at any point. Docket 48 ¶ 8 (only disputing the relevance of such fact). But another individual did: before the collision, a 911 caller reported seeing Kelley's car in the middle of the lane and that "somebody almost hit them." Docket 50-2. The caller further explained that "when people are going this fast on the interstate and it's a white car, you don't notice that they're stopped completely[.]" *Id.*

Kelley also did not attempt to leave her car at any point. Docket 48 ¶ 6 (not disputing that Kelley remained in the car but disputing this fact's relevance). The temperature outside was 18 degrees Fahrenheit. Docket 41-4 at 3. The record contains ambiguities over whether there was a coat inside of Kelley's car for her to wear. *Compare* Docket 41-1 (showing Kelley's statement to AAA representative that "the heat's off in the car and I only have like on a short sleeve shirt because I'm going to a business meeting so . . . um . . . I didn't plan on spending anytime like out of the car, you know?"); *with*, Docket 51 ¶ 8 (Kelley's husband's affidavit stating that when he retrieved Kelley's personal items from the car, he received Kelley's winter coat).

That same day, VanIperen was driving a 2020 semi-truck loaded with fuel, traveling north on I-29 near Brookings, South Dakota. Docket 61 ¶ 15. VanIperen was an employee of Harms Oil Company. *Id.* While driving in the right hand lane, VanIperen crossed over the fog line into the right shoulder multiple times. *See* Docket 41-3; *see also* Docket 61 ¶ 16 (only disputing relevance). The weather outside was clear and the visibility was about 9.9 miles. Docket 41-4 at 3.

Minutes after weaving twice over the fog line, VanIperen crashed into Kelley's vehicle. *Id.* VanIperen's truck destroyed the rear half of the Equinox and killed Kelley. Docket 61 ¶¶ 20-21; *see also* Docket 50-3. Kelley's death certificate lists Kelley's interval of death as "instant." Docket 41-7 at 2.

At the time VanIperen ran into Kelley, there was nothing on the road blocking his view of the Equinox. *See* Docket 41-3. Additionally, VanIperen did not attempt to stop or swerve the truck at any point. *Id.* Leading up to the crash, VanIperen was on his phone using Tik Tok and making online purchases. *See* Docket 61 ¶ 23 (disputing only the relevance). At the time of the collision, VanIperen had an application open on his phone called "Balls Crush – Bricks Breaker." *Id.* (only disputing the relevance).

## STANDARD

Summary judgment is appropriate if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party can meet this burden by presenting evidence that there is no genuine dispute of material fact

or that the nonmoving party has not presented evidence to support an element of its case on which it bears the ultimate burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). The moving party must inform the court of the basis for its motion and identify the portions of the record that show there is no genuine issue in dispute. *Hartnagel v. Norman*, 953 F.2d 394, 395 (8th Cir. 1992) (citation omitted).

To avoid summary judgment, "[t]he nonmoving party may not 'rest on mere allegations or denials, but must demonstrate on the record the existence of specific facts which create a genuine issue for trial.' " *Mosley v. City of Northwoods*, 415 F.3d 908, 910 (8th Cir. 2005) (quoting *Krenik v. Cnty. of Le Sueur*, 47 F.3d 953, 957 (8th Cir. 1995)). Summary judgment "must be denied if on the record then before it the court determines that there will be sufficient evidence for a jury to return a verdict in favor of the nonmoving party." *Krenik* 47 F.3d at 957. It is precluded if there is a genuine dispute of fact that could affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).

Generally, when considering a motion for summary judgment the court views the facts and the inferences drawn from such facts "in the light most favorable to the party opposing the motion." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986) (quoting *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962)). In cases involving cross motions for summary judgment, however, the standard summary judgment principles apply with equal force, though the approach is slightly modified. *See*

8

*Woodstone Ltd. P'ship v. City of Saint Paul*, 2023 WL 3586077, at *5 (D. Minn. May 22, 2023). "[T]he court views the record in the light most favorable to plaintiff when considering defendant's motion, and the court views the record in the light most favorable to defendant when considering plaintiff's motion." *Thompson-Harbach v. USAA Fed. Sav. Bank*, 359 F. Supp. 3d 606, 614 (N.D. Iowa 2019).

## APPLICABLE LAW

Federal courts sitting in diversity apply the substantive law of the forum state. *See Chew v. Am. Greetings Corp.*, 754 F.3d 632, 635 (8th Cir. 2014). In doing so, federal courts must follow the decisions of the state's supreme court interpreting the forum's law. *See C.S. McCrossan Inc. v. Fed. Ins. Co.*, 932 F.3d 1142, 1145 (8th Cir. 2019). If a state's supreme court has not directly spoken on an issue, the court must predict how the state's supreme court would decide such issue. *GEICO Cas. Co. v. Isaacson*, 932 F.3d 721, 725-26 (8th Cir. 2019). In making this prediction, the court relies on "relevant precedent, analogous decisions, considered dicta, and any other reliable data." *Thompson v. Harrie*, 59 F.4th 923, 926 (8th Cir. 2023). Here, the court is sitting in diversity and thus South Dakota substantive law applies. *See* Docket 6.

## DISCUSSION

This discussion section consists of three broad sub-sections. First, the court addresses plaintiff's and defendants' cross-motions for summary judgment on the issue of whether Kelley was contributorily negligent. Docket 39 at 4-14; Docket 47 at 12-17. Second, the court addresses plaintiff's and

defendants' cross-motions for summary judgment on the issue of whether
Kelley assumed the risk. Docket 39 at 14-17; Docket 47 at 5-11. And third, the
court addresses defendants' motion for summary judgment on plaintiff's
survival claim, defendants' motion for summary judgment on the availability of
punitive damages under plaintiff's wrongful death claim, plaintiff's request to
take judicial notice of various documents, and plaintiff's request for the court
to certify the punitive damages issue to the South Dakota Supreme Court. *See*
Docket 39 at 17-21; Docket 47 at 17-30; Docket 55; Docket 57. The court
addresses defendants' motion to strike throughout the order, as the relevant
portions naturally arise during the court's discussion of the issues. Docket 67.

## I.   Contributory Negligence

"When an action sounds in negligence,[7] contributory negligence is
available to temper the defendant's liability." *Thompson v. Mehlhaff*, 698
N.W.2d 512, 524 (S.D. 2005). "Contributory negligence is negligence on the
part of a [decedent] which, when combined with the negligence of a defendant,
contributes as a legal cause in the bringing about of the injury to the
[decedent]." *Kultman v. Sioux Falls Storm*, 769 N.W.2d 440, 450 (S.D. 2009)
(quoting *Steffen v. Schwan's Sales Enters., Inc.*, 713 N.W.2d 614, 619 (S.D.
2006)). "The fact that the [decedent] may have been guilty of contributory

---

[7] Plaintiff's claims sound under a survival claim and wrongful death claim
rather than a pure negligence claim. *See* Docket 6. But this difference does not
matter, because the South Dakota Supreme Court has applied both the
contributory negligence and assumption of risk defenses to a wrongful death
action and survival action. *See Welch v. Haase*, 672 N.W.2d 689, 694-96 (S.D.
2003). Thus, the court applies these defenses to plaintiffs' claims here.

negligence does not bar a recovery when the contributory negligence of the [decedent] was slight in comparison with the negligence of the defendant . . . ." SDCL § 20-9-2. But if a decedent's negligence is more than slight compared to defendants' negligence, the plaintiff is barred from recovery. *See Johnson v. Armfield*, 672 N.W.2d 478, 481 (S.D. 2003). If the record contains evidence to support the issues, questions of negligence and contributory negligence are for the jury in all but the rarest of cases. *Jensen v. Menard*, 907 N.W.2d 816, 820 (S.D. 2018); *see also Johnson v. Matthew J. Batchelder Co., Inc.*, 779 N.W.2d 690, 693-94 (S.D. 2010) (explaining that questions regarding negligence and contributory negligence are generally questions for the jury and that it is "rare[]" for such questions to be purely legal ones).

"The question of a [decedent]'s contributory negligence is a two-step inquiry." *Westover v. East River Elec. Power Co-op., Inc.*, 488 N.W.2d 892, 897 (S.D. 1992). First, the factfinder must decide whether the decedent and defendant were negligent. *See id.* Second, assuming both were, the factfinder must compare the decedent's and defendant's negligence. *See id.* Where a decedent's negligence is more than slight compared to the defendant's negligence, the plaintiff may not recover so long as the decedent's negligence is the proximate cause of the injury. *See Johnson*, 672 N.W.2d at 481.

### A. Whether Kelley was Negligent

Plaintiff argues that contributory negligence is inapplicable here because no reasonable jury could find that Kelley was negligent at all. *See* Docket 47 at 13-17. In support, plaintiff relies on *Steffen*, where the South Dakota Supreme

11

Court held that the trial judge erred in instructing the jury on contributory negligence because the plaintiff was lawfully stopped on the road at the time a driver rear-ended plaintiff. *See* 713 N.W.2d at 620-21. In *Steffen*, the plaintiff, Steffen, drove on a road without shoulders when an emergency vehicle came towards her with its lights and sirens on. *See id.* at 616. As required under South Dakota law, Steffen pulled over and waited for the emergency vehicle to pass. *See id.* The driver of a delivery truck, Koch, was headed the same direction as Steffen. *See id.* According to Steffen, Koch was not looking forward, but rather to the left. *See id.* Steffen could not move because there were two parked cars in front of her. *See id.* at 618. Koch tried to stop when he noticed Steffen, but could not and rear-ended Steffen. *See id.* At trial, the defendant (Koch's employer) asked for a contributory negligence instruction, and the trial court gave one over Steffen's objection. *See id.* at 617.

The South Dakota Supreme Court reversed, holding the trial court erred in giving a contributory negligence instruction. *Id.* at 621. As is relevant here, the Court noted that Steffen was lawfully stopped in the road due to the emergency vehicles that had driven past her moments before. *See id.* at 620-21. Even though Steffen had started to move her vehicle after the emergency vehicles had passed, the Court observed that "drivers should not be held contributorily negligent merely because they fail to resume travel fast enough to avoid being rear-ended." *Id.* at 620. Because Steffen was lawfully stopped and defendant did not challenge her testimony that she could not move because of the two stationary vehicles in front of her, the Court found

12

defendant failed to meet its burden to justify the giving of a contributory negligence instruction. *See id.* The Court also observed that contributory negligence "should be limited to instances where the rear ended driver stopped both unexpectedly and unwarrantedly." *Id.* at 620 n.3 (emphasis omitted).

Analogizing Kelley's situation to that of Steffen's, plaintiff argues the court must grant summary judgment on finding contributory negligence inapplicable here because "Kelley did not stop both abruptly and unwarrantedly," as required under *Steffen. See* Docket 47 at 13-14. The court disagrees. Unlike in *Steffen*, where the evidence showed that Steffen justifiably stopped in the middle of the lane (because of the emergency vehicle, the presence of two stationary vehicles in front of her, and the fact that there was no shoulder on the road), here, the parties have submitted a genuine dispute on whether Kelley justifiably stopped without pulling over to the shoulder of the interstate.

Viewed in the light most favorable to defendants, the record shows that Kelley failed to fuel up with enough gas and failed to pull over to the side of the road. For example, during Kelley's phone calls with AAA, Kelley explained "I'm driving a rental car, it told me I had backup fuel but like apparently I didn't and the car just like stopped." Docket 41-1. Kelley also stated,

> I'm in a rental car, and it told me that I had like this thing called fuel reserve . . . [i]t said that my fuel was low, but then it said I had like 20 miles of fuel for reserves so I was like alright well I'm a mile from a gas station I should be fine, but then the car just stopped.

Docket 41-2. Furthermore, Kelley stated, "I'm in the right lane of I-29 interstate and I just need somebody to come here quickly so I can get gas in my car and

not like freeze." *Id.* [8] Based on Kelley's repeated, real-time statements indicating that her fuel was low and that she believed she ran out of fuel, a jury could reasonably find that Kelley negligently failed to properly fuel her car and that this failure caused her car to stop.

Even if the Equinox stopped working for reasons unrelated to running out of gas, a reasonable jury could find that Kelley was negligent for not pulling over to the shoulder of the road. It is undisputed that Kelley was driving on an interstate with a speed limit of 80 miles per hour. *See* Docket 41-4; Docket 48 ¶ 1. A reasonable jury could conclude that once Kelley's engine stopped (regardless of the reason), her car's momentum would not cause it to stop immediately. With the car still in motion, a reasonable jury could find that Kelley was negligent for not pulling over to the shoulder of the road as the car came to a gradual stop.

---

[8] Plaintiff objects to these statements as being immaterial and as speculative. Docket 48 ¶ 2. The court overrules both objections. First, evidence that Kelley failed to fill up her gas tank is material because a reasonable jury could conclude that her failure to do so was negligent, which directly relates to defendants' contributory negligence argument. Second, some of Kelley's statements here are not speculative, because she is explaining what she personally observed (the fuel gauges in the car). Thus, at least some of these statements alone are not speculative—Kelley did not state that her car stopped *because of* low fuel, but rather she is simply stating her observations. But even if Kelley's explanations, in context, make the leap from stating what the fuel gauges showed to opining that the lack of fuel caused her car to stop, the court finds it admissible under Rule 701 because her opinion is rationally based on her perception, it is helpful to determine why the car stopped, and does not require technical, scientific, or other expertise. *See* Fed. R. Evid. 701. It is reasonable for Kelley, as a layperson, to conclude that her car stopped because she ran out of gas. Thus, the court overrules plaintiff's second speculation objection.

In short, because a reasonable jury could find Kelley either failed to properly fuel her car, failed to pull over to the shoulder of the road, or both, a jury could reasonably find that the position Kelley found herself in was unwarranted. For this reason, Kelley's situation differs from *Steffen*, where it was undisputed that the driver was warranted in stopping for an emergency vehicle. *See Steffen*, 713 N.W.2d at 620-21.

Furthermore, the record contains additional evidence that would allow a jury to reasonably conclude Kelley acted negligently. It is undisputed that Kelley did not call 911 immediately after finding herself stalled in the middle of the right-hand lane on the interstate, but rather decided to call AAA. *See* Docket 48 ¶ 8 (disputing only the relevance). A reasonable jury could find that a person stuck in the middle of an interstate with cars flying by should call 911 immediately so that emergency personnel can escort that person to safety or at the very least set up a few barriers to give drivers more warning of a stalled car, and that by not doing so, the person failed to exercise reasonable care. That is particularly so, given that the first AAA representative repeatedly asked Kelley whether Kelley was in a safe location and mentioned multiple times the possibility that Kelley call 911 due to her location. *See* Docket 41-1. If the AAA representative sensed there was potential danger, a reasonable jury could find that Kelley—who, unlike the AAA representative, was there to understand the full context of her situation—was negligent in failing to call 911 immediately.

Additionally, Kelley remained in the Equinox, even though she was in the right-hand lane of an interstate. *See* Docket 48 ¶ 9 (disputing only the

15

relevance). At least one individual was concerned about Kelley's situation, because shortly before the crash, a person other than Kelley called 911 and reported seeing Kelley's car parked in the interstate and that "somebody almost hit them." Docket 50-2. A reasonable jury could find that Kelley knew, or should have known, of the danger she was in, that a car almost hit her, and that she should have left the car and moved herself to the side of the road. In short, a reasonable jury could find that Kelley acted negligently, and it would be up to the jury to determine if that negligence was more than slight compared to defendants. *See* SDCL § 20-9-2; *see Johnson*, 672 N.W.2d at 481. Summary judgment in favor of plaintiff on this issue is inappropriate.

Defendants, on the other hand, argue that the undisputed evidence shows Kelley was indeed negligent. Defendants analogize the facts of this case to those in *Myers v. Quenzer*, 110 N.W.2d 840, 843 (S.D. 1961) and *Haase v. Willers Truck Serv., Inc.*, 34 N.W.2d 313, 317-19 (S.D. 1948), both of which the South Dakota Supreme Court confronted car accidents and held the plaintiffs were contributorily negligent. *See* Docket 39 at 6-9. In both cases, the Court explained that a person who unnecessarily places and maintains themself in danger is contributorily negligent. *See Myers*, 110 N.W.2d at 843 ("In such circumstances [plaintiff] would be guilty of contributory negligence because she unnecessarily placed and maintained their car in a position of danger."); *Haase*, 34 N.W.2d at 317 ("One may not unnecessarily place and maintain oneself in such a dangerous position and then require others who failed to discover his peril to respond in damages.").

16

But at this summary judgment stage, neither case requires summary judgment in favor of defendants on the issue of contributory negligence. In *Myers*, the plaintiff stopped and backed up her vehicle, while on a two-lane highway, at the bottom of a hill. *See* 110 N.W.2d at 841, 843. When she started to drive forward, a pickup truck came over the hill and collided with plaintiff's vehicle. *Id.* The Supreme Court found the trial court erred when it refused to instruct the jury on contributory negligence and stated, "[w]hether it was slight or more than slight under our comparative negligence would be for the jury." *Id.* at 843.

Similarly in *Haase*, the decedent, Haase, was a tow truck driver who attempted to pull a car out of a ditch. *See Haase*, 34 N.W.2d at 314-15. A sheriff had parked his law enforcement vehicle near the car in the ditch and turned his hazard lights to warn oncoming traffic of their presence on the road. *See id.* at 315. Instead of moving his tow truck to the shoulder of the road to work under the protection of the sheriff's warning lights, Haase placed his tow truck in a way that blocked the traffic's general view of the sheriff's hazard lights and then crawled under the tow truck to begin working. *See id.* at 315-17. A passing truck struck the tow truck, causing the tow truck to crush Haase to death. *See id.* at 316.

The Court in *Haase* observed:

[Haase] took an unnecessary risk. He placed his truck so that it obstructed a portion of the 20-foot ribbon of pavement. No reason is or can be suggested which justified him in failing to remove his truck at least to the 8-foot shoulder while he was putting on his chains.

17

*Id.* at 316. Like in *Myers*, there were no circumstances that required Haase to place himself in danger—indeed, the South Dakota Supreme Court explicitly stated the opposite, in that there was no reason why Haase put himself in the place he did. *See id.*

But unlike both *Myers* and *Haase*, the record here contains a genuine dispute about whether Kelley unnecessarily placed herself in danger. Viewed in the light most favorable to plaintiff, a reasonable juror could find that Kelley's car stopped unexpectedly and that she could not move her car to the shoulder in time. Starting with the gas, on November 15, 2022 at 10:22 p.m. (the night before the car accident), Rodriguez purchased 13.83 gallons of gas. Docket 51-1; *see also* Docket 48 ¶ 1 (showing date of car accident as November 16, 2022). A retired law enforcement officer, Officer Daryl Reemtsma, test drove a 2020 Chevrolet Equinox with a 1.5-liter engine to determine its gas mileage on the trip from Gretna, Nebraska (Kelley's starting destination) to Brookings, South Dakota. Docket 53 ¶¶ 1-2; *see also* Docket 51-1 (showing Kelley purchased gas in Gretna, Nebraska). Officer Reemtsma conducted this test starting at a gas station located in Gretna, Nebraska, and filled the Equinox up with fuel, documenting the mileage on the odometer, the temperature, and the wind speed. Docket 53 ¶¶ 2-3. Officer Reemtsma then stopped at a rest stop near Sergeant Bluff, Iowa, again recording the mileage on the odometer, the temperature, and the wind speed. *Id.* ¶ 5. Officer Reemtsma then drove to Sioux Falls, South Dakota, stopping the vehicle and documenting the mileage on the odometer, the temperature, and the wind-speed. *Id.* ¶ 6. Officer

18

Reemtsma headed to Brookings, South Dakota, where he documented the odometer mileage, temperature, and windspeed again. While in Brookings, South Dakota, Officer Reemtsma also filled the tank with 8.253 gallons of fuel. *Id.* ¶ 7.

During Officer Reemtsma's trip, he drove the posted speed limits and used cruise control when possible. *Id.* ¶ 8. Officer Reemtsma determined that the trip from Gretna, Nebraska to Brookings, South Dakota, comprised approximately 253 miles, and the vehicle showed that he could have travelled 191 miles further until the gas tank was empty. *Id.* ¶ 9. Officer Reemtsma determined that the vehicle averaged approximately 30 miles per gallon, which would leave at least 6 gallons of fuel remaining in the tank. *Id.* ¶ 10. Based on Officer Reemtsma's test drive, a reasonable jury could conclude that Kelley's car did not run out of gas and that her car stalled for a different reason.

In response to Officer Reemtsma's affidavit, defendants argue his "test drive" is insufficient to show a material dispute of fact about whether plaintiff's car ran out of gas. Docket 60 at 8-9. First, defendants argue Officer Reemtsma's test drive is too dissimilar from Kelley's actual drive, given the potential differences is weather, wind, route, speed, and the fact that Officer Reemtsma drove a different unit (but same model and year of car) as compared to Kelley. *See id.* But highlighting these differences goes to the weight the jury should place on Officer Reemtsma's testimony and are thus questions for the jury. Second, defendants argue that the test drive does not present a genuine dispute of material fact about whether Kelley ran out of gas because of the

statements she made moments after her car stopped running. According to defendants, Kelley's statement, "I just need someone to come here quickly so I can get . . . so I can get gas," "unequivocally" shows she ran out of gas, and nothing about Officer Reemtsma's test drive contradicts her statement. *See id.*; *see* Docket 41-2. But Kelley's statements, while relevant, are not dispositive on whether she was out of gas, because a reasonable jury could find that she made that statement based on her guess at the time, without complete information, as to why her car stopped running. In other words, Kelley could have been wrong. Furthermore, contrary to defendants' suggestion, Kelley's contemporaneous statements do not definitively prove the car ran out of gas because she stated that when her fuel light went on, the car indicated it could go 20 more miles and that she was approximately one mile away from the gas station when the car suddenly stopped. *See* Docket 41-2.

Even if the vehicle stopped because it ran out of fuel, a reasonable jury could find that Kelley reasonably relied on the fuel light indicating the car could drive for 20 additional miles, and that her attempt to get to the next gas station was reasonable. *See id.* Thus, a reasonable jury could conclude that even if Kelley did in fact run out of gas, Kelley reasonably believed she could make it to the next gas station. In short, the record contains material disputes of fact about whether Kelley acted negligently.

Next, defendants argue that even if Kelley's car stopped for reasons unrelated to running out of gas, Kelley negligently failed to maneuver her car to the shoulder of the road once the car stopped accelerating. *See* Docket 39 at 6-

20

7, 10. While a reasonable jury could so find, a reasonable jury could also find that Kelley's failure to move to the shoulder of the road was reasonable in the circumstances. If Kelley's car stopped running, she would have had a limited window of time to pull off to the shoulder of the road—which is particularly true given that Kelley's car was stopped while going uphill. *See* Docket 41-3. A reasonable jury could find that Kelley did not have sufficient time to pull over to the shoulder or that she reasonably froze and panicked. Regardless, a reasonable jury could find Kelley did not act negligently in failing to pull over to the shoulder of the road.

Defendants next argue that even if Kelley did not negligently place herself in danger originally, she was negligent for remaining in her car and not "exiting her vehicle to the safety of the shoulder." *See* Docket 60 at 10; Docket 39 at 10. Defendants highlight that Kelley's calls to AAA reveal that there were various vehicles that passed her at high speeds, showing that she should have realized she was in danger and should have exited her vehicle. *See* Docket 41-1; Docket 41-2; *see also* Docket 39 at 9. But Kelley activated the Equinox's hazard lights and called AAA. Docket 61 ¶ 11 (not disputing that Kelley activated hazard lights); *see also* Docket 41-1 (hazard lights in background); Docket 41-2 (same). Furthermore, a jury could find she reasonably chose not to get out of her vehicle in the middle of the interstate because of the cars passing by at high rates of speed (indeed, a 911 caller reported seeing somebody "almost hit" Kelley) and because of the cold weather. *See* Docket 41-1; Docket 41-2; Docket

41-4 at 3 (showing temperature was 18 degrees Fahrenheit); Docket 50-2.[9] A reasonable jury could find Kelley acted reasonably given her circumstances. Thus, because a reasonable jury could find Kelley did not unnecessarily place or maintain herself in danger, the court rejects defendants' arguments that Kelley was contributorily negligent as a matter of law under *Myers* and *Haase*.

For similar reasons, the court also rejects defendants' arguments that Kelley was contributorily negligent as a matter of law because she violated two traffic statutes. *See* Docket 39 at 13-14. Defendants cite two statutes, SDCL § 32-25-5 and SDCL § 32-25-5.1, both of which prohibit drivers from driving too slowly. Section 32-25-5 specifically provides that unless a driver has a permit, such driver may not travel along on a national interstate highway at less than forty miles per hour. *See* SDCL § 32-25-5. Section 32-25-5.1 provides that "[n]o person may drive a motor vehicle at such a slow speed as to impede the normal and reasonable movement of traffic except when reduced speed is necessary for safe operation or in compliance with law." SDCL § 32-25-5.1.

"Violation of a safety statute is negligence as a matter of law unless it is legally excused." *Stensland v. Harding Cnty.*, 872 N.W.2d 92, 96 (S.D. 2015) (quoting *Baddou v. Hall*, 756 N.W.2d 554, 559 (S.D. 2008)). Individuals

---

[9] Plaintiff argues that Kelley's decision to stay in the car is consistent with "prevailing guidance given to motorists." Docket 47 at 11. In support, plaintiff cites various articles. *Id.* at 11 n.7. Defendants argue the court must not consider these articles because they are inadmissible hearsay. *See* Docket 60 at 19 n.14. The court does not decide this issue at this stage because even without considering the articles, the court finds a reasonable jury could find Kelley acted reasonably when she stayed in her car.

asserting legal excuse bear the burden of proving they are in fact legally excused. *See Dartt v. Berghorst*, 484 N.W.2d 891, 894 (S.D. 1992). The South Dakota Supreme Court has recognized at least four instances when an individual is legally excused:

> (1) anything that would make compliance with the statute impossible; (2) anything over which the driver has no control which places his car in a position violative of the statute; (3) an emergency not of the driver's own making by reason of which he fails to observe the statute; and (4) an excuse specifically provided by statute.

*Albers v. Ottenbacher*, 116 N.W.2d 529, 531 (S.D. 1962); *see also Gaillard v. Jim's Water Serv., Inc.*, 535 F.3d 771, 776 (8th Cir. 2008) (applying *Albers*). Whether an individual is legally excused is generally a question for the jury. *See, e.g.*, *Dartt*, 484 N.W.2d at 894-95 ("[T]he jury must have concluded [defendant's] violation was legally excused."). For the reasons discussed above, a jury could reasonably conclude that Kelley's car stopped moving through no fault of her own—i.e. that her car simply stopped working—making her compliance with the two South Dakota speed statutes "impossible" or indicating she "ha[d] no control" over her car's positioning. *See Albers*, 116 N.W.2d at 531. Similarly, jury could also reasonably find Kelley faced an emergency "not of [her] own making." *Id.* Either way, a jury could reasonably conclude Kelley was legally excused. The court rejects defendants' arguments to the contrary.[10]

---

[10] Defendants argue that plaintiff has waived its opportunity to respond to defendants' original arguments regarding whether Kelley was legally excused from violating these two safety statutes. *See* Docket 68 at 2-4 (citing Docket 39 at 13-14). Though defendants correctly note that plaintiff did not expressly

Defendants also highlight Kelley's failure to call 911 as another example of her alleged negligence. *See* Docket 39 at 6. But Kelley called AAA immediately, which a jury could find as a reasonable step to take. *See* Docket 48 ¶ 7; Docket 41-1; Docket 41-2. A reasonable jury could find Kelley was not negligent for not calling 911.

Defendants next argue that Kelley was negligent for not bringing appropriate winter attire in the car. *See* Docket 39 at 6. Her failure to have appropriate winter clothing, defendants argue, matters because "[i]f [Kelley] did not have a coat, she was negligent for not dressing in a manner that would allow her to exit her vehicle." Docket 60 at 10.[11] But according to Kelley's husband, after the crash, he received Kelley's personal items from the car, which included Kelley's winter coat. Docket 51 ¶ 8. A reasonable jury could find that Kelley did in fact have a winter coat in the car.

---

reference defendants' negligence *per se* arguments, plaintiff did repeatedly argue that Kelley was not at fault for the position in which she found herself. *See* Docket 47 at 12-17. The court exercises its discretion in generously construing plaintiff's response in Docket 47. Still, in doing so, the court does not consider plaintiff's arguments in pages 14-17 of Docket 63 with respect to negligence *per se*, and thus the court denies as moot defendants' request to strike such arguments (plaintiff's brief in pages 14-17 of Docket 63).

[11] Defendants alternatively argue that even if Kelley did have a coat, she was negligent for not wearing it and then exiting her car. Docket 60 at 10. But for the reasons above, the court finds that a reasonable jury could conclude Kelley acted reasonably in staying in her car given that she activated her hazard lights and that she could also place herself at risk by exiting her car while on an interstate. *See* Docket 48 ¶ 9 (not disputing that Kelley stayed in car); Docket 60 ¶¶ 7 (not disputing Kelley's car was in right hand lane of I-29); 11 (not disputing that Kelley activated hazard lights).

Defendants argue that Kelley's husband's statement is not sufficient to save plaintiff for two reasons. First, defendants argue that Kelley's husband's affidavit is inadmissible hearsay. Docket 60 at 10. But the court may consider this evidence so long as it could be presented in an admissible form. *See Smith v. Kilgore*, 926 F.3d 479, 485 (8th Cir. 2019) ("[T]he standard is not whether the evidence at the summary judgment stage would be admissible at trial—it is whether it could be presented at trial in an admissible form." (quoting *Gannon Int'l, Ltd. v. Blocker*, 684 F.3d 785, 793 (8th Cir. 2012)). Kelley's husband could testify at trial that he received Kelley's coat, and this testimony would be admissible. Thus, the court may consider Kelley's husband's affidavit at the summary judgment stage.

Second, defendants also challenge the accuracy of Kelley's husband's statement. In support, defendants note that Kelley's husband claims to have found gas receipts and Kelley's coat, but only took a picture of the gas receipt. *See* Docket 60 at 10. Thus, defendants suggest that Kelley's husband did not actually recover a coat because if he did, he would have taken a picture of it. *See id.* This argument goes to the credibility of Kelley's husband's assertions and thus is for the jury to decide. The court rejects defendants' argument regarding Kelley's coat.

Next, defendants' compare this instant case with *Lindolm v. BMW of N. Am., LLC*, 202 F. Supp. 3d 1082, 1100 (D.S.D. 2016), a case that granted summary judgment to the defendant with respect to the plaintiff's negligence claims because the decedent was contributorily negligent as a matter of law.

*See* Docket 39 at 5. In *Lindolm*, the decedent, Alex, used a jack to hold up a car while Alex went underneath the car to perform work, even though the jack was designed only to change or replace tires and even though the jack came with warnings (both in a manual and on the jack itself) explicitly stating not to rely on a jack to hold up a car while underneath the car to perform work. *See Lindolm*, 202 F. Supp. 3d at 1096. In finding Alex misused the product and was contributorily negligent, the court stressed that Alex ignored multiple express warnings. *See id.* at 1096-98. Defendants argue that "[l]ike the decedent in *Lindolm*, [Kelley]'s negligence was primary and allowed for the circumstances causing her death." Docket 39 at 5.

But *Lindolm* is distinguishable from this instant case. Alex and Kelley faced quite different circumstances. In *Lindolm*, there was no evidence that Alex faced a stressful situation where time was of the essence. Instead, Alex ignored several warnings and chose to improperly use a jack without any other apparent reason to do so and without any apparent attending stressors. *See Lindolm*, 202 F. Supp. 3d at 1096-98. For example, Alex was not attempting to rely on the jack to fix a car because he needed to fix it immediately or because he had no other access to a more appropriate tool. *See id.* But here, Kelley was in the middle of an interstate with cars passing by having to make a quick decision on what to do. *See* Docket 48 ¶ 4 (not disputing that Kelley stopped in the right driving lane); *see also* Docket 41-1 (AAA phone recording revealing cars driving by); Docket 41-2 (same). As explained above, a reasonable jury could find that Kelley faced her circumstances through no fault of her own and

26

that she made reasonable choices given such circumstances. This case is not one of the "rare" cases in which the court should decide the issue of contributory negligence rather than a jury. *See Jensen*, 907 N.W.2d at 820. *Lindolm* does not require a different result.

Finally, defendants' arguments ignore how Kelley's (alleged) negligence compares to VanIperen's actions. *See generally* Docket 39 (no comparison); Docket 61 (same). Instead, defendants argue only that Kelley's (alleged) negligence was more than slight. *See* Docket 39 at 5-14; *see also* Docket 61 (no mention of comparison requirement). But this articulation is misleading: defendants are only entitled to contributory negligence if the jury also finds that Kelley's negligence was more than slight *compared to VanIperen's negligence*. SDCL § 20-9-2; *see Johnson*, 672 N.W.2d at 481. Under this comparison scheme, the greater a defendant's negligence, the greater leeway the law gives the plaintiff. *See* SDCL § 20-9-2; *Johnson*, 672 N.W.2d at 481.

Here, a reasonable jury could find that Kelley's negligence was slight compared to VanIperen because a reasonable jury could find VanIperen was negligent and that his negligence was significant. In the minutes before the collision, VanIperen's truck swerved multiple times over the fog line in the right-hand lane. *See* Docket 41-3; *see also* Docket 61 ¶ 16 (only disputing relevance). A jury could also reasonably find that the weather outside and the driving conditions posed no external reason for the crash because it was sunny, clear day and the roads were not icy. *See* Docket 41-3. Furthermore, VanIperen's video camera footage shows that he had plenty of time to react if

27

he had looked ahead at the road and observed Kelley's car. *See id.* But VanIperen made no attempts to stop or brake his truck, or to swerve in the moments leading to the crash. *See id.* Instead, a jury could reasonably find that VanIperen was completely distracted because he was playing a game on his phone while driving a truck full of oil. *See id.*; Docket 61 ¶ 15 (not disputing VanIperen's truck was loaded with fuel); ¶ 23 (only disputing relevance about phone usage). Based on these factors, a jury could reasonably find that Kelley's negligence—if any—was slight compared to VanIperen's negligence. Summary judgment in favor of defendants on this issue is inappropriate here.

In short, the record contains many factual disputes that the jury must resolve, which all bear on these central questions: was Kelley contributorily negligent, and if so, was it more than slight compared to VanIperen's? Because the record contains factual disputes directly bearing on these questions, the court denies plaintiff's partial motion for summary judgment and defendants' motion for summary judgment with respect to whether Kelley was contributorily negligent. [12]

---

[12] As part of the contributory negligence argument, defendants also move to strike Docket 64-2 because plaintiff introduced it only in his reply to his motion for partial summary judgment, even though he could have referenced it in his initial motion for summary judgment or his response to defendants' motion for summary judgment. Docket 68 at 5-6. Even if plaintiff's reliance on Docket 64-2 in his reply brief to his motion for partial summary judgment is impermissible, plaintiff only cites Docket 64-2 twice, both times for factual propositions that are largely already in the record. *See* Docket 63 at 2 (citing Docket 64-2 for proposition that VanIperen was playing video games on phone for at least 20 minutes leading up to crash), 10 (citing Docket 64-2 for proposition that Kelley turned on her hazards). The court does not rely on Docket 64-2 in reaching any of its conclusions, so the court denies defendants' motion to strike Docket 64-2 as moot.

## II.    Assumption of the Risk

A plaintiff who assumes the risk is precluded from recovering. *See Westover v. East River Elec. Power Co-op., Inc.*, 488 N.W.2d 892, 897 (S.D. 1992). Assumption of the risk requires that the person "(1) had actual or constructive knowledge of the risk; (2) appreciated its character; and (3) voluntarily accepted the risk, with the time, knowledge, and experience to make an intelligent choice." *Jensen*, 907 N.W.2d at 820 (quoting *Duda v. Phatty McGees, Inc.*, 758 N.W.2d 754, 758 (S.D. 2008)). Defendants bear the burden of proving assumption of risk, *Burhenn v. Dennis Supply Co.*, 685 N.W.2d 778, 786 (S.D. 2004), and "[t]he failure to establish any one of the three elements negates the defense." *Stone v. Von Eye Farms*, 741 N.W.2d 767, 772 (S.D. 2007). Just like negligence and contributory negligence, assumption-of-risk cases should generally go to a jury, because cases involving assumption-of-risk that involve purely legal questions are "rare." *See Schott v. S.D. Wheat Growers Ass'n*, 906 N.W.2d 359, 364 (S.D. 2017).

To prove the first two requirements, defendants must prove that Kelley "not only kn[ew] of the facts that create[d] the danger, but [she] must [have] comprehend[ed] and appreciate[d] the danger itself." *Id.* at 362 (quoting *Duda*, 758 N.W.2d at 758)). In most situations, this requirement is subjective: Kelley herself must have actually known about the facts creating the danger and known of the danger she faced. *See Jensen*, 907 N.W.2d at 822. But contrary to plaintiff's suggestion, South Dakota law recognizes that "[t]here are some risks as to which no adult will be believed if [she] says that [she] did not know or

29

understand them." *Schott*, 906 N.W.2d at 362-63. (quoting Restatement (Second) of Torts § 496D cmt. c); *see* Docket 63 at 21 (arguing that "Kelley's subjective belief is controlling under the law"). Thus, South Dakota law recognizes that a person may have constructive knowledge of the risk, in which case "the knowledge and appreciation-of-danger elements are not purely subjective questions[.]" *Id.* at 362. "A person is deemed to have appreciated the risk 'if it is the type of risk that no adult of average intelligence can deny.'" *Duda*, 758 N.W.2d at 758 (quoting *Ray v. Downes*, 576 N.W.2d 896, 900 (S.D. 1998)). Ultimately, whether an individual knew or should have known of risks are ordinarily questions for the jury, and "may be resolved by the court only where 'reasonable [people] would not differ on the question [of] whether the [plaintiff] assumed the risk.'" *Id.* (quoting *Myers v. Lennox Co-op Ass'n*, 307 N.W.2d 863, 864-65 (S.D. 1981)).

A threshold issue the court must address is how to properly characterize the risk that Kelley may or may not have assumed. Defendants frame the risk broadly, arguing the risk involved is that "stopped vehicles on highways get rear-ended." Docket 60 at 18; *see also* Docket 39 at 14-17. On the other side of the spectrum, plaintiff frames the risk much more narrowly, arguing the risk was that "VanIperen was playing a game on his cell phone and failing to maintain a proper lookout while driving a Mack truck loaded with 50,000 pounds of fuel." Docket 47 at 8.

The South Dakota Supreme Court's decision in *Ray v. Downes* explains why neither articulation is fully accurate. In *Ray*, the Court dealt with the

issue of whether the plaintiff, Ray, had assumed the risk of an injury that was caused by the defendant, Waldner. *See* 576 N.W.2d at 899-90. There, Ray had agreed with Waldner to help Waldner harvest soybeans and corn. *See id.* at 897. As part of harvesting, Waldner typically used a "swing-type auger" to transport the grain from an 18-wheeled semi-tractor/trailer to bins. *See id.* One day, the ground was too high to put the auger under the trailer, so Ray scraped the ground to make room for the auger. *See id.* Ray then volunteered to help Waldner place the auger under the trailer as Waldner drove the trailer forward. *Id.* The two agreed that Ray would use hand signals and then "holler" for Waldner to stop when the auger was in place. *See id.* After Ray positioned the auger, he hollered for Waldner to stop. *See id.* The record contained a dispute over whether Ray also signaled to Waldner. *See id.* Regardless, Waldner did not stop the trailer, and as a result, the trailer ran over Ray's leg. *See id.*

In his deposition, Ray admitted that he knew that the job was risky and that it was risky for him to be so close to the rear wheels of the trailer. *See id.* at 899. Ray admitted seeing the trailer continue moving forward and that he knew if it did not stop, it would run over his leg. *See id.* Ray also admitted to knowing that he was taking the risk of injuring his leg and that he voluntarily put himself in that position. *See id.* Reviewing this testimony, the circuit court granted summary judgment in favor of Waldner, finding that there could be no dispute over whether the first two elements of assumption of risk were satisfied, and that Ray also acted voluntarily and had other reasonable alternatives. *See id.* at 898-99.

31

But the Supreme Court reversed. Crucially, the Court explained that while " '[r]isk is intrinsic to some acts' . . . this intrinsic risk is not unlimited." *Id.* at 899 (quoting *Goepfert v. Filler*, 563 N.W.2d 140, 143 (S.D. 1997)). The Court elaborated:

> Certainly, Ray put himself in harm's way by standing in a position to be run over. He frankly admitted as much. Nonetheless, he did not consent to relieve the driver of his subsequent duty to act with reasonable care. In the words of Prosser, 'This is a distinction which has baffled a great many law students, some judges, and unhappily a few very learned legal writers.' Prosser & Keeton, *The Law of Torts* § 68, at 485.

*Id.* The Court further emphasized that nothing in the record suggested that Ray anticipated Waldner would disregard Ray's signals when moving the truck. *Id.* at 900. Crucially, the Court stated, "Ray's awareness of danger was not consent to relieve Waldner of his duty of care. Not every acceptance of known danger may reasonably be interpreted as evidence of such consent." *Id.* Instead, the Court made clear that "[a]lthough one may assume the risk of the negligence of another *if he is fully informed of such negligence*, one is not, under the doctrine of assumption of risk, bound to anticipate the negligent conduct of others." *Id.* (emphasis added). As a result, the Court reversed the circuit court's decision to grant summary judgment in favor of Waldner. *See id.*

In reaching this conclusion, the Court then quoted from Prosser's Law of Torts, and in doing so included a strikingly similar hypothetical to the situation here:

> It is here that there is the greatest misapprehension and confusion as to assumption of risk, and its most frequent misapplication. It is not true that in any case where the plaintiff voluntarily encounters

a known danger he necessarily consents to any future negligence of the defendant. A pedestrian who walks across the street in the middle of a block, through a stream of traffic traveling at excessive speed, cannot by any stretch of the imagination be found to consent that the drivers shall not use care to watch for him and avoid running him down. On the contrary, he is insisting that they shall. This is contributory negligence pure and simple; it is not assumption of the risk. And if A leaves an automobile stopped at night on the traveled portion of the highway, and his passenger remains sitting in it, it can readily be found that there is consent to the prior negligence of A, whose control over the risk has terminated, but not to the subsequent negligence of B, who thereafter runs into the car from the rear.

*Id.* at 899-900.

The South Dakota Supreme Court's discussion in *Ray* teaches a key lesson about how to appropriately define the "risk" an individual has assumed for purposes of the assumption of risk defense: the relevant inquiry is whether Kelley was aware of a risk that VanIperen would negligently hit Kelley. *See Ray*, 576 N.W.2d at 899-900. Consider all three situations in *Ray*. Starting with the actual facts of *Ray*, Ray admitted that he knew there was a risk that the trailer could run over him and that he could get seriously injured. *See id.* at 899. Yet, he had no reason to suspect that Waldner would act negligently by ignoring Ray's signals (after having just discussed with Ray the plan to have Ray signal to Waldner to stop the trailer). *See id.* at 900. Without this specific knowledge that Waldner would ignore Ray (either actual or constructive), Ray could not have assumed the risk of Waldner's negligence. *See id.* The same is true with the pedestrian hypothetical: the pedestrian who crosses the road while it was full of traffic has surely entered a dangerous position and knows (or should know) there is a real risk of being hit. But knowing the risk of being hit is not

33

dispositive because the key inquiry is whether the pedestrian had any knowledge (actual or constructive) of the specific risk that drivers would act negligently and fail to attempt to avoid him. *See id.* If not, the pedestrian did not assume the risk of being negligently hit by a driver. *Id.* And finally, the passenger in the stationary car parked in the middle of the road at night surely knows or should know that he is in danger of being hit. But again, the passenger did not assume the risk of being hit by B based off B's negligence if the passenger had no actual or constructive knowledge of the risk that B would act negligently.

Applying *Ray*'s lessons and viewing the record in the light most favorable to defendants, no reasonable jury could find that Kelley assumed the specific risk that VanIperen would negligently hit her. To be sure, viewed in the light most favorable to defendants, Kelley knew (or should have known) that she was in a dangerous location when parked in the middle of an interstate. But as *Ray* teaches, Kelley's knowledge of the general risk of her being hit is not dispositive. *See Ray*, 576 N.W.2d at 899-900. Rather, what matters is whether Kelley was fully informed (or should have known) that *VanIperen* specifically would act negligently. Just as there was nothing in the record to suggest Ray knew or should have known that Waldner would disregard Ray's signals, so too there is nothing in the record to suggest that Kelley knew or should have known that VanIperen would not be paying attention to the road. Specifically, at the time Kelley chose to remain in her car in the middle of the right-hand lane, Kelley had no reason to know that VanIperen was driving while

34

distracted, nor did she have any reason to know he had swerved multiple times
minutes before the collision. Docket 61 ¶¶ 16 (only disputing relevance), 21
(same); Docket 41-3. Thus, although possibly contributorily negligent as
explained above, Kelley could not have assumed the risk in this case because
there are no facts suggesting Kelley had the requisite knowledge (either actual
or constructive) that VanIperen was acting negligently.

Importantly, the scope of the risk, as plaintiff argues, is not so narrow
that Kelley must have known or should have known that VanIperen was
playing Balls Crush – Bricks Breaker while driving a fuel truck. *See* Docket 47
at 8. Just because Kelley had no actual or constructive knowledge of the
specific app VanIperen had open, or even that VanIperen was on his phone,
does not necessarily mean that she did not assume the risk of VanIperen
acting negligently. For example, if Kelley knew VanIperen was driving while
closing his eyes and yet still chose to remain in her car, she would have
assumed the risk that VanIperen was acting negligently and would hit her. The
key is whether Kelley knew or should have known that VanIperen was acting
negligently, and yet still assumed that risk. Because the record contains no
evidence that Kelley knew or should have known that VanIperen was acting
negligently in any way, this case is one in which she cannot have assumed the
risk as a matter of law. *See Schott*, 906 N.W.2d at 364.

Defendants resist this conclusion, arguing the relevant risk is the risk
that Kelley would be hit while parked in the middle of an interstate. *See* Docket
60 at 16-17; Docket 39 at 14-17. In support of their view, defendants cite

language from *Sheard v. Hattum*, in which the South Dakota Supreme Court stated " '[t]ypical examples of risks within every adult's constructive knowledge are that 'one can burn from fire, drown in water, or fall from heights.' " 965 N.W.2d 134, 147 (S.D. 2021); Docket 60 at 16-17. The typical examples in *Sheard*, defendants reason, are all general risks, meaning that the general risk of being hit while stopped on the highway is the correct framing of the risk at issue. *See* Docket 60 at 16-17.

But *Sheard*'s discussion regarding the "typical" risks associated with various activities answers a different question than the one here. The question here is how to appropriately *define* the risk at issue. *Sheard*'s discussion answers whether a *given* risk is sufficiently obvious to a plaintiff such that the plaintiff had constructive knowledge of such risk. *See Sheard*, 965 N.W.2d at 146-47. Nothing about *Sheard* evinces any intent to collapse these two separate inquiries, nor does it indicate any intent to overrule *Ray*. And *Ray* answers the relevant question here: what is the risk that Kelley may have assumed in the first place? Thus, the court rejects defendants' argument that the relevant risk Kelley faced was the risk of being hit from behind because this risk is too broad.

The court makes one final note. It is true that *Ray* involved a slightly different procedural posture as compared to the one in this instant case. In *Ray*, the circuit court granted summary judgment in favor the defendant, and the Supreme Court reversed. *See Ray*, 576 N.W.2d at 899-90. In doing so, the Court remanded the case back to the circuit court, and specifically the Court

"preserve[d] the opportunity for Waldner . . . to pursue traditional tort defenses such as assumption of the risk at trial." *Id.* at 890. This court acknowledges that its ruling goes one step further than *Ray*: not only does the court here reject defendants' arguments for summary judgment on the issue of assumption of the risk, but the court also grants summary judgment on this same issue in favor of plaintiff.

But *Ray*'s decision to allow Waldner to present an assumption of risk defense at re-trial stems from the factual disputes at issue in the case. In *Ray*, a reasonable jury could find that Ray did indeed assume the risk that Waldner would specifically run over Ray even with the agreement the two had made. Specifically, although it was undisputed that Ray "hollered" for Waldner to stop, the record also contained evidence that the surrounding machinery was loud and that at least some of the windows to Waldner's trailer were rolled up. *See id.* at 897, 897 n.1. And viewing the record in the light most favorable to Waldner, a reasonable jury could find that Ray knew, or should have known, that it may be difficult for Waldner to hear Ray's hollering because Ray knew of the surrounding noise and that some of Waldner's windows were up. *See id.* Relatedly, the record contained a factual dispute over whether Ray actually signaled to Waldner for Waldner to stop the trailer. *See id.* at 897 ("Either Ray did not signal or Waldner did not see Ray's signals . . . ."). Thus, a jury could reasonably find Ray did in fact assume the risk because it could reasonably find Ray had specific knowledge that Waldner would not hear Ray and that Ray did not actually signal to Waldner for Waldner to stop the trailer. *See id.* at

897, 897 n.1. In short, even though *Ray* permitted Waldner during the re-trial to raise an assumption of the risk defense, it did so because the facts of the case warranted such potential defense. Nothing about *Ray* forecloses summary judgment in favor of a plaintiff on the issue of assumption of the risk in an appropriate case.

And here, Kelley's situation is one such case. Unlike the record in *Ray*, where a jury could find Ray knew Waldner would ignore Ray yet still chose to help Waldner, the record here contains no evidence that Kelley knew or had reason to know that VanIperen specifically would hit her. There is nothing in the record to indicate Kelley was aware that VanIperen was on his phone, driving distractedly, or anything else to indicate why she should get out of the car specifically to avoid VanIperen's negligence. This case would be different if, for example, Kelley had learned from a source that VanIperen was on his phone heading her way and that she nevertheless remained in the car. In that case, a jury could reasonably find that she assumed the risk that VanIperen would hit her. But here, there is no evidence that Kelley had any indication of VanIperen's negligence. Based on the present record, no reasonable jury could find that Kelley assumed the risk of VanIperen running into her. The court grants summary judgment in favor of plaintiff on whether Kelley assumed the risk and denies defendants' request for summary judgment on the same.

## III.   Survival Claim, Wrongful Death, Punitive Damages, Certification, and Judicial Notice

Having found summary judgment inappropriate on defendants' affirmative defenses, the court turns to whether summary judgment is

appropriate on any of plaintiffs' claims for other reasons. Defendants move for summary judgment on plaintiff's survival claim. *See* Docket 39 at 17-18. Defendants also move for summary judgment on plaintiff's request for punitive damages. *See id.* at 19-22. In response, plaintiff argues that summary judgment is inappropriate on Kelley's survival claim because discovery is not complete. *See* Docket 47 at 17-18. With respect to punitive damages, plaintiff argues summary judgment is inappropriate for a variety of reasons, including that (1) punitive damages are available in plaintiff's survival claim; (2) the court should certify to the South Dakota Supreme Court the question of whether punitive damages are available on plaintiff's (and others') wrongful death suit; and (3) if the court declines to certify the issue, punitive damages are available in wrongful death suits as a matter of statutory interpretation. *See* Docket 47 at 18-30; Docket 57. The court addresses these arguments in turn. Before doing so, the court briefly recounts the legal background for survival and wrongful death actions under South Dakota law.

South Dakota law authorizes two related, but distinct, causes of action for situations in which an individual dies. One cause of action is a survival claim under SDCL § 15-4-1. Section 15-4-1 provides that "[a]ll causes of action shall survive and be brought, notwithstanding the death of the person entitled or liable to the same." A survival claim under SDCL § 15-4-1 allows for a decedent to recover injuries for which she herself would have been able to recover, but for her death. *See* SDCL § 15-4-1; *Yellow Horse v. Pennington Cnty*, 225 F.3d 923, 926 n.3 (8th Cir. 2000). In contrast, a wrongful death

claim "allow[s] for recovery of damages where a defendant caused 'the death or injury of a person ... by a wrongful act, neglect, or default.' " *Lindholm*, 202 F.Supp.3d 1082, 1100 (D.S.D. 2016) (quoting SDCL § 21–5–1)). The Eighth Circuit has succinctly explained the differences between these two statutes:

> In South Dakota, a wrongful death cause of action is brought in the name of the decedent's personal representative and seeks compensation for the decedent's next of kin for their pecuniary injury, rather than for an injury to the decedent himself. In contrast, a survival action is the decedent's own personal cause of action, which does not abate at decedent's death, but is brought by a representative seeking damages the decedent could have obtained for injuries had he survived.

*Yellow Horse*, 225 F.3d at 926 n.3.

A survival claim under SDCL § 15-4-1 allows a plaintiff to recover punitive damages. *See* SDCL § 21-3-2; *Ammann v. Massey-Ferguson, Ltd.*, 933 F. Supp. 840, 842 (D.S.D. 1996). The parties dispute whether punitive damages are available under a wrongful death claim. *See* Docket 39 at 19-21; Docket 47 at 18-29.

## A. Survival Claim

Under South Dakota law, "there can be no recovery for pain and suffering while an injured person is unconscious and damages are only allowable for such time as the injured person is conscious." *Plank v. Heirigs*, 156 N.W.2d 193, 200 (S.D. 1968); *see also Sander v. Geib, Elston, Frost Pro. Ass'n*, 506 N.W.2d 107, 127 (S.D. 1993) (citing *Plank* and interpreting *Plank*'s discussion in the context of the survival statute SDCL § 15-4-1); *Krumm v. Feuerhelm*, 298 N.W.2d 184, 189 (S.D. 1980) (finding a jury instruction

explaining "[w]hen an injured person is killed instantly, or dies without regaining consciousness, damages cannot be awarded for pain and suffering" to be proper). Thus, "[w]hen an injured person is killed instantly . . . damages cannot be awarded for pain and suffering." *Plank*, 156 N.W.2d at 200-01. This conclusion also aligns with the majority of states. *See* Restatement (Second) of Torts, § 926 (1979) (explaining that in cases where the defendant has caused the decedent's death, most states do not allow recovery under a survival statute "when death immediately results from the tort without an appreciable period of suffering intervening[.]"). So the issue here is whether the record contains a genuine dispute of material fact regarding whether Kelley died instantly upon the crash.

Defendants argue that plaintiff's survival claim must fail because the record contains no evidence to suggest Kelley suffered any personal injury prior to dying. *See* Docket 39 at 17-18. The court agrees. Here, evidence in the record suggests Kelley died instantly. First, Kelley's calls with the AAA agents suggest she did not experience pre-impact terror or any extreme emotional distress moments before the crash. *See* Docket 41-1; Docket 41-2. In fact, when talking with the first AAA agent in the minutes leading up to the collision, Kelley stated, "Um. I'm not really sure if I'm in a safe location. I'm just like . . . I'm just on the interstate like in the first lane." Docket 42-1. A few minutes later with a different AAA agent, Kelley stated, "Like I'm kind of in a safe location, I'm in the right lane of I-29 interstate." Docket 41-2. Even viewed in the light most favorable to plaintiff, Kelley's statements to AAA agents in the

41

minutes leading up to the crash indicate Kelley felt ambivalent about whether she was safe in the car and do not show she felt terror or any extreme emotional distress right before the crash.

Furthermore, at the time VanIperen crashed into Kelley's car, Kelley was still talking to an AAA agent. *See* Docket 41-2 (faint crash sound in background). At no point during this call does the call include any evidence of Kelley screaming in pain or stating that she felt she was in immediate danger. *See id.* To the contrary, the AAA agent attempted to ask Kelley a series of questions, such as "You say you need gas? You want us to come bring you gas? Hello? Hello?", to which Kelley did not respond. *See id.* This contemporaneous evidence also supports the conclusion that Kelley did not experience any pain, because if she did, she would have screamed, and the AAA agent would have panicked.

Second, Kelley's death certificate also supports this conclusion. *See* Docket 39 at 18. Specifically, under the section of "cause of death," the certificate states, "head, neck and chest trauma" and "motor vehicle accident." Docket 41-7 at 2. Under the section labeled "interval:" the certificate states "instant." *Id.*

Third, while alone not dispositive, the video of VanIperen's crash shows that VanIperen slammed into Kelley's car at a very high rate of speed. *See* Docket 41-3. The video shows Kelley's car snap in half immediately. *Id.* The picture of Kelley's car after the crash confirms the awful nature of this

42

accident. *See* Docket 50-3. These items support a finding that Kelley died instantly.

Taking the AAA calls, death certificate, and video and photo of Kelley's car, the record suggests Kelley died immediately after VanIperen ran into her car. The court finds that defendants have reached their initial burden in pointing to sufficient evidence in the record to prove Kelley died instantly, which, if undisputed, entitles defendants to summary judgment on Kelley's survival claim.[13] *See Celotex*, 477 U.S. at 322-23; *Plank*, 156 N.W.2d at 200-01. Because defendants met their initial burden, plaintiff now must demonstrate specific facts in the record that create a genuine dispute for trial. *See Mosley*, 415 F.3d at 910.

In plaintiff's initial response, plaintiff did not point to any specific facts in the record to dispute that Kelley died instantly. Instead, plaintiff argued that the court should delay summary judgment until plaintiff has a chance to obtain additional discovery under Civil Rule of Procedure 56(d). *See* Docket 47 at 17. Later, in a reply brief to defendant's response to plaintiff's motion for summary judgment, plaintiff referenced and attached his expert's—Dr.

---

[13] The court need not decide whether a plaintiff is entitled to other kinds of injuries in his survival claim—apart from the decedent's physical or emotional pain and suffering—such as funeral costs or loss to the car, because plaintiff has submitted no evidence that the decedent's estate had to pay any funeral expenses and it is undisputed that Kelley did not own the Equinox. *See* Docket 48 ¶ 14 (only disputing the relevance that plaintiff rented the Equinox from Enterprise Rent-A-Car Company – Midwest, LLC); *Cf. Rubeck v. Huffman*, 374 N.E.2d 411, 413-14 (Ohio 1978) (noting that there was no evidence that decedent suffered property loss in fatal car crash because there was no evidence that decedent owned the car).

Ziejewski's—report. *See* Docket 63 at 23. But neither of these attempts are persuasive, and the court grants summary judgment in favor of defendants on plaintiff's survival claim.

The court begins with Rule 56(d). Rule 56(d) provides:

**When Facts Are Unavailable to the Nonmovant.** If a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition, the court may:

> (1) defer considering the motion or deny it;
>
> (2) allow time to obtain affidavits or declarations or to take discovery; or
>
> (3) issue any other appropriate order.

Fed. R. Civ. P. 56(d). The purpose of this rule is to prevent a court from unfairly ruling on a motion when a party has not yet had an opportunity to discover additional evidence that would allow the moving party's claim to survive. *See Johnson v. Moody*, 903 F.3d 766, 772 (8th Cir. 2018). To succeed on a Rule 56(d) motion, plaintiff must show: "(1) that [he] ha[s] set forth in affidavit form the specific facts that [he] hope[s] to elicit from further discovery, (2) that the facts sought exist, and (3) that these sought-after facts are 'essential' to resist the summary judgment motion." *Id.* (quoting *Toben v. Bridgestone Retail Operations, LLC*, 751 F.3d 888, 895 (8th Cir. 2014)). "Rule 56(d) does not condone a fishing expedition where a plaintiff merely hopes to uncover" some favorable evidence. *Id.* And "[i]f a party fails to carry its burden, 'postponement of a ruling on a motion for summary judgment is unjustified.' " *Marlow v. City of Clarendon*, 78 F.4th 410, 416 (8th Cir. 2023) (quoting *Stanback v. Best Diversified Prods., Inc.*, 180 F.3d 903, 911 (8th Cir. 1999)).

A party cannot meet its burden by making "unspecific assertion[s]" and by "not explain[ing] how the evidence he sought was relevant 'to rebut [the defendants'] showing of the absence of a genuine issue of fact.' " *Id.* (quoting *Ray v. Am. Airlines, Inc.*, 609 F.3d 917, 923 (8th Cir. 2010)) (first and third alterations in original). For example, in *Marlow*, a case where a police officer sued the City of Clarendon for illegally retaliating against him by terminating him, the Eighth Circuit found the district court properly refused to extend discovery under Rule 56(d). *See id.* at 413, 417. There, the officer requested Rule 56(d) relief, and in support, merely stated that he "obviously need[ed] the ability to cross examine [the Chief] about the termination meeting" and that he "need[ed] the deposition of [another witness] who interviewed [the Chief]." *Id.* at 417. Observing that these explanations were "unspecific assertion[s]" and that the officer failed to explain how this evidence was relevant to dispute defendants' showing of the absence of a genuine issue of fact, the Eighth Circuit found the district court did not abuse its discretion in denying the officer's motion for further discovery. *See id.*

Here, with respect to the issue of when Kelley died, plaintiff filed a Rule 56(d) affidavit that states the following:

> Defendants assert Kelley Rodriguez died immediately upon impact. No autopsy was conducted. No photographs were taken of Kelley's body following the collision. No discovery has occurred on this issue. Because of this, it is unknown at this time whether Kelley Rodriguez survived for a time following the collision. Defendants' motion seeking judgment as a matter of law on punitive damages is premature.

Docket 54 ¶ 4. Plaintiff's Rule 56(d) affidavit also asserts:

> No depositions have been taken in this case . . . . [VanIperen's] deposition is necessary to issues of liability, punitive damages, and Defendants' affirmative defenses. Plaintiff has engaged a mechanical engineering expert to inspect the 2020 Chevrolet Equinox . . . [i]t is unknown at this time what the full nature and extent of the experts' respective opinions will be.

*Id.* ¶¶ 7-9. Based on these submissions, plaintiff's Rule 56(d) affidavit falls short. Generously construed, the affidavit meets the first requirement— that plaintiff has set forth in affidavit form the specific facts that he hopes to elicit from further discovery—because it asserts plaintiff hopes to elicit facts through further discovery that show Kelley did not die immediately. *See id.* ¶¶ 4, 7-9; *Moody*, 903 F.3d at 772.

But plaintiff's affidavit fails to demonstrate that additional facts surrounding Kelley's death "exist," as is required under *Moody. See Moody*, 903 F.3d at 772. In fact, plaintiff's affidavit suggests the opposite. By stating that "[n]o autopsy was conducted" and that "[n]o photographs were taken of Kelley's body following the collision," plaintiff acknowledges potential sources of information that could contradict whether Kelley died immediately do not exist in this case. *See* Docket 54 ¶ 4. Plaintiff also gestures to VanIperen's deposition testimony, but plaintiff does not state which facts he expects to arise from VanIperen's testimony that would speak to the specific issue of whether Kelley died immediately, mirroring the defect in *Marlow. See id.* ¶ 8; *see also Marlow*, 78 F.4th at 417 (finding bald assertion that plaintiff needed deposition of witness to be insufficient). Furthermore, as a lay witness and driver of the truck (who by necessity was not with Kelley at the time of the collision), it is

not readily apparent what admissible testimony VanIperen could give on the timing and cause of Kelley's death. *See* Fed. R. Evid. 701 (limiting a lay witness's testimony which is rationally based on witness's perception and excluding testimony requiring scientific, technical or other specialized knowledge).

The closest plaintiff's affidavit gets to alleging facts surrounding Kelley's death exist is plaintiff's statement that it has engaged a mechanical engineering expert to inspect the 2020 Chevrolet Equinox. *See* Docket 54 ¶ 9. But this statement alone is insufficient. Plaintiff has not explained what specifically he hopes this expert inspection will reveal about the car and how that directly connects to the timing of Kelley's death. Without specifying what plaintiff hopes this mechanical engineer's inspection of the car would show as it relates to whether Kelley died instantaneously, plaintiff has failed to meet the second requirement under Rule 56(d). *Johnson*, 903 F.3d at 772. In short, the deficiencies in plaintiff's affidavit in Docket 54 replicate those in *Marlow*: plaintiff's affidavit is not specific enough and fails to adequately explain how the evidence he seeks is relevant to rebut whether Kelley died immediately. *See Marlow*, 78 F.4th at 417.

Perhaps sensing this gap, plaintiff attempts to further elaborate the extent of the expert's conclusions and what plaintiff hopes these conclusions will show in a separate filing—plaintiff's reply brief filed with regard to plaintiff's initial partial summary judgment motion. *See* Docket 63 at 23. Specifically in plaintiff's reply brief, plaintiff asserts that his expert, Dr. Mariusz

Ziejewski, has opined that the Equinox driven by Kelley had sufficient survival space for Kelley and that the car's recorded acceleration was also consistent with Kelley surviving the initial collision. *See id.* (quoting Dr. Ziejewski's report in Docket 64-3); *see also* Docket 64-3 at 12-13. According to plaintiff, Dr. Ziejewski's report shows there is a genuine dispute of material fact regarding the timing of Kelley's death. *See* Docket 63 at 23.

Even after considering the substance of plaintiff's reply brief and Dr. Ziejewski's report,[14] the court declines to postpone ruling on summary judgment on this issue. Even if some of Dr. Ziejewski's opinions—that there was sufficient survival space for Kelley and that the acceleration her car experienced would produce injuries that she could survive—are admissible under Rule 702, these opinions are insufficient to raise a genuine dispute over whether Kelley died instantly. *See* Docket 64-3 at 12-13.

---

[14] Defendants move the court to strike the portion of plaintiff's reply brief that discusses plaintiff's survival claim (pages 22-23 in Docket 63), including discussions of Dr. Ziejewski's report. *See* Docket 67; Docket 68 at 1. Defendants also move the court to not consider Dr. Ziejewski's report. Docket 67; Docket 68 at 1. In support, defendants state that plaintiff submitted these items in his reply brief to plaintiff's motion for summary judgment, but plaintiff did not move for summary judgment on his survival claim. *See* Docket 68 at 1-2; *see also* Docket 46 (moving only for summary judgment on defendants' affirmative defenses and on the issue of punitive damages under wrongful death statute); Docket 47 at 5-29. As a result, defendants argue that plaintiff's items are aimed at refuting defendants' motion for summary judgment, in which case such items constitute an impermissible sur-reply. Docket 68 at 1-2, 4-12. The court need not rule on whether to strike these submissions because, for the reasons stated below, even considering these submissions, the court finds they are insufficient to justify plaintiff's Rule 56(d) request. Thus, the court denies defendants' motion to strike the portion of plaintiff's reply brief that discusses plaintiff's survival claim and Dr. Ziejewski's report as moot.

Defendants have submitted sufficient evidence in the record to show that Kelley actually died instantaneously; Dr. Ziejewski's opinions simply state that the car's condition and the impact on the car made it possible that Kelley survived. To be sure, Dr. Ziejewski's opinions regarding the car's condition are relevant and support plaintiff's argument that Kelley did not die instantly. But they are insufficient alone because getting from Dr. Ziejewski's opinions regarding the possibility that an individual *could* survive in the car to the conclusion that Kelley *did in fact* survive requires improper speculation. To the extent that Dr. Ziejewski also opines that Kelley did indeed survive, the court finds that such an opinion would be inadmissible under Rule 702 because Dr. Ziejewski, as an engineer, is not a medical doctor and has no relevant education or experience to make cause of death determinations. *See id.* at 1-2 (showing Dr. Ziejewski's qualifications); *Hirchak v. W.W. Grainger, Inc.*, 980 F.3d 605, 609 (8th Cir. 2020) ("An expert may proceed as far as—but no further than—his specialized knowledge assists him in going."). In short, Dr. Ziejewski's report is insufficient to show a genuine dispute over whether Kelley died instantly.

In a final effort, plaintiff notes in his reply brief that "[t]he time in which Kelley died remains disputed as further conclusions from Dr. Ziejewski are dependent upon additional discovery." Docket 63 at 23. Setting aside that plaintiff's counsel failed to make this submission in an affidavit as required under Rule 56(d), *see Moody*, 903 F.3d at 772, this representation is insufficient to justify delay. First, this submission lacks the requisite specificity

49

on what plaintiff expects Dr. Ziejewski's new opinions will be, because it merely asserts that Dr. Ziejewski will reach "further conclusions." *See Marlow*, 78 F.4th at 417. Second, as discussed above, even if this submission was specific enough, Dr. Ziejewski's additional opinions would not create a genuine dispute over whether Kelley died immediately because he lacks the requisite qualifications to opine on the timing of her death. Thus, the court rejects plaintiff's final argument.

In summary, plaintiff has failed to show that the record contains a genuine dispute of fact that Kelley died instantly. Plaintiff has not identified a medical expert or any other competent evidence to show that Kelley did not die immediately. As a result, the court grants defendants' motion for summary judgment on plaintiff's survival claim because an instantaneous death necessarily means Kelley did not suffer any physical or mental injuries, which are necessary to prove a survival claim. *See Plank*, 156 N.W.2d at 200-01.

### B. Punitive Damages Under Wrongful Death Claim

Next, defendants move for summary judgment on the issue of whether punitive damages are available in plaintiff's wrongful death claim. Docket 39 at 19-22. In response, plaintiff moves the court to certify the issue to the South Dakota Supreme Court. Docket 47 at 26; Docket 57. In the alternative, plaintiff moves the court to find that punitive damages, in appropriate cases, may be available in wrongful death claims. *See* Docket 47 at 29-30. Defendants oppose certification. Docket 66.

### 1. Certification

The court first addresses plaintiff's certification request. The decision to certify a question rests "in the sound discretion of the federal court." *Saunders v. Thies*, 38 F.4th 701, 716 (8th Cir. 2022) (quoting *McKesson v. Doe*, 592 U.S. 1, 5 (2020) (per curiam)). Certification for every open question of state law is not obligatory. *Lehman Bros. v. Schein*, 416 U.S. 386, 390-91 (1974). Indeed, the court should not "trouble [] sister state courts every time an arguably unsettled question of state law comes across [its] desk[]." *Pino v. United States*, 507 F.3d 1233, 1236 (10th Cir. 2007). "State certification procedures . . . can prolong the dispute and increase the expenses incurred by the parties[,]" and "[o]ur system of 'cooperative judicial federalism' presumes federal and state courts alike are competent to apply federal and state law." *McKesson*, 592 U.S. at 5.

In exercising its discretion, the court considers the state supreme court's authority to answer a certified question. After all, if the South Dakota Supreme Court cannot properly answer a certified question, the court should not certify the question. *See* SDCL § 15–24A–1 (outlining the requirements and limits for when the South Dakota Supreme Court can answer a certified question). Additionally, the court also considers various other factors, including but not limited to the level of uncertainty the court has about the issue, how often the issue is likely to reoccur in the state, and whether any of the parties seek certification. *See Bernstein v. Bankert*, 733 F.3d 190, 221 (7th Cir. 2013); *Royal Cap. Dev., LLC v. MD Cas. Co.*, 659 F.3d 1050, 1055 (11th Cir. 2011).

Beginning with South Dakota's statutory scheme on certification, under SDCL § 15–24A–1, a federal court may certify a question of law to the South Dakota Supreme Court if there is a question of South Dakota law "which may be determinative of the cause pending" in the federal court and it appears "that there is no controlling precedent" in the South Dakota Supreme Court's decisions. Defendants first argue that certification on this issue is not appropriate because resolution of the issue upon which plaintiff seeks— whether punitive damages are available in a wrongful death action—is not determinative of the cause pending. *See* Docket 66 at 3-5. In support, defendants correctly note that this issue only pertains to what damages are available to plaintiff and does not affect the validity of plaintiff's wrongful death claim, much less plaintiff's entire lawsuit (which includes other claims wholly untouched by this issue). *See id.* The court acknowledges that the phrase "may be determinative of the cause pending" is ambiguous and has generated differing interpretations, some of which align with defendants' view. *See Thai Meditation Assoc. of AL, Inc. v. City of Mobile*, 980 F.3d 821, 838 (11th Cir. 2020) (describing similar language in Alabama's rule as "downright opaque" and outlining various courts' interpretations); *Volvo Cars of N. Am., Inc. v. Ricci*, 137 P.3d 1161, 1163-64 (Nev. 2006) (outlining various approaches).

But the court need not reach the scope of "may be determinative of the cause pending," however, because the court declines to exercise its discretion to certify the question based on other factors. The first factor the court considers—the level of uncertainty this court has on the issue—cuts heavily

against certification. For reasons explained below, while the South Dakota Supreme Court has not directly spoken on whether punitive damages are available in a wrongful death claim, the court believes there is sufficient data upon which the court can draw to make a reasonably certain prediction. The second factor the court considers—how often the issue is likely to reoccur— cuts in favor of certification because federal district courts, including this court, have had to predict this issue in the past. *See Sheesley v. The Cessna Aircraft Co.*, 2006 WL 1084103, at *27 (D.S.D. Apr. 20, 2006); *Bethel v. Janis*, 597 F. Supp. 56, 58-59 (D.S.D. 1984). The third factor—whether any of the parties has requested certification—initially cuts in favor of certification because plaintiff requests certification. *See* Docket 57.

But the court "should be slow to honor a request for certification from a party who chose to invoke federal jurisdiction." *Smith v. SEECO, Inc.*, 922 F.3d 406, 412 (8th Cir. 2019) (quoting 17A Charles A. Wright *et al.*, *Federal Practice & Procedure* § 4248 (3d. ed. 2017 update)); *see also Fischer v. Bar Harbor Banking and Trust Co.*, 857 F.2d 4, 8 (1st Cir. 1988) (finding plaintiff's certification request "particularly inappropriate" because "he had knowledge of the state of the law under his theories for recovery, and had the choice of forums to file suit, either in the local courts or the federal court under diversity jurisdiction"); *Seaboard Sur. Co. v. Garrison, Webb & Stanaland, P.A.*, 823 F.2d 434, 438 (11th Cir. 1987) ("Having sought a Federal forum, [plaintiff] must abide by federal determination as to the present state of Florida law."); *Reyton Cedar Knoll, LLC v. HPG Int'l Inc.*, 2007 WL 9751941, at *1 (M.D. Pa. June 1,

2007) ("[T]he fact that Plaintiff chose to invoke federal jurisdiction in the first instance further supports a federal court's hesitancy to certify this issue."). Here, plaintiff is the one who seeks certification to the South Dakota Supreme Court, but plaintiff is the party who filed in federal court to begin with. *See* Docket 1; Docket 57. If plaintiff wanted South Dakota courts to decide this issue, he could have filed in state court. He did not.

Weighing these factors and recognizing they cut in opposite directions, the court exercises its discretion and declines to certify the issue.

### 2. Whether Punitive Damages are Available Under South Dakota's Wrongful Death Statute

As mentioned above, the South Dakota Supreme Court has not yet decided whether the present wrongful death cause of action authorizes punitive damages. Without controlling authority, the court must predict how the South Dakota Supreme Court would decide this issue, *GEICO*, 932 F.3d at 725-26, relying on "relevant precedent, analogous decisions, considered dicta, and any other reliable data[,]" *Thompson*, 59 F.4th at 926.

The issue here requires the court to interpret the interaction between various statutes. The South Dakota Supreme Court's approach to statutory interpretation begins with the relevant statutes' texts. *See Farm Bureau Life Ins. Co. v. Dolly*, 910 N.W.2d 196, 199-200 (S.D. 2018). In doing so, the court must give the texts' words their plain meaning and effect, assuming the South Dakota Legislature has said what it means and means what it says. *See McLane Western Inc. v. S.D. Dep't of Revenue*, 2 N.W.2d.3d 247, 251 (S.D. 2024); *Reck v. S.D. Bd. of Pardons and Paroles*, 932 N.W.2d 135, 140 (S.D.

2019). At the same time, the court does not construe statutes in a vacuum: the court must consider them as a whole, looking to their structure and overall context. *LeFors v. LeFors*, 991 N.W.2d 675, 683 (S.D. 2023); *Endres v. Endres*, 984 N.W.2d 139, 152 (S.D. 2022). Relatedly, the court must consider other enactments relating to the same subject and construe them "so as to have them exist in harmony," because "it is inappropriate to select one statute on a topic and disregard another statute which may modify or limit the effective scope of the former statute." *South Dakota v. Jucht*, 821 N.W.2d 629, 635 (S.D. 2012); *In re Expungement of Oliver*, 810 N.W.2d 350, 352 (S.D. 2012).

At first glance, SDCL §§ 21-1-4, 21-5-1, and 21-5-7, appear to collectively exclude punitive damages from wrongful death actions. Starting with SDCL § 21-1-4, the South Dakota Legislature has provided the default rule: punitive damages are unavailable "unless expressly provided by statute." Turning to the wrongful death cause of action, SDCL § 21-5-1 provides that a person who wrongfully causes the death of another "shall be liable, to an action for damages[.]" SDCL § 21-5-1. And under the section entitled "Damages proportionate to pecuniary injury to beneficiaries[,]" SDCL § 21-5-7 provides: "In every action for wrongful death the jury may give such damages as they may think proportionate to the pecuniary injury resulting from such death to the persons respectively for whose benefit such action shall be brought."

Defendants argue that these statutes unambiguously exclude punitive damages from wrongful death claims. Docket 66 at 9. After all, given that punitive damages are not available unless expressly authorized by statute and

because neither SDCL §§ 21-5-1 nor 21-5-7 expressly provide for the availability of punitive damages under the wrongful death statute, defendants argue that such damages are not available in wrongful death claims. *See id.* Defendants point out that SDCL § 21-5-7 specifically contemplates the availability of pecuniary damages (which are not punitive damages), and thus the Legislature's mentioning of pecuniary damages confirms that had it wished to allow for punitive damages it would have expressly said so. *See id.*; *see also Wilcox v. Vermeulen*, 781 N.W.2d 464, 469-70 (S.D. 2010) (explaining pecuniary damages include economic loss and the "loss of the decedent's companionship and society . . . ."); *Fluth v. Schoenfelder Constr., Inc.*, 917 N.W.2d 524, 533 (S.D. 2018) (recognizing punitive damages "may be awarded 'for the sake of example . . . by way of punishing the defendant' and 'are distinct from and "in addition to actual damage." ' " (quoting *Wyman v. Terry Schulte Chevrolet, Inc.*, 584 N.W.2d 103, 107 (S.D. 1998)). In defendants' view, because SDCL § 21-5-7 "does not even use or mention the word 'punitive,' it would be improper to construe the statute as contemplating punitive damages." Docket 60 at 21-22.

But nothing in SDCL § 21-5-7 states that pecuniary damages are the *exclusive* remedy available under wrongful death claims. In fact, SDCL §§ 21-1-4, 21-5-1, and 21-5-7 are not the final words on the availability of punitive damages. Entitled "Punitive damages in discretion of jury[,]" SDCL § 21-3-2 provides:

> In *any* action for the breach of an obligation not arising from contract, where the defendant has been guilty of oppression, fraud, or malice, actual or presumed, or in any case of wrongful injury to

56

> animals, being subjects of property, committed intentionally or by willful and wanton misconduct, in disregard of humanity, the jury, in addition to the actual damage, may give damages for the sake of example, and by way of punishing the defendant.

SDCL § 21-3-2 (emphasis added). Because punitive damages are available (provided defendants' actions are sufficiently severe) in "any action for the breach of an obligation not arising from contract," the issue here is whether a violation of the wrongful death statute constitutes "any action for the breach of an obligation not arising from contract." SDCL § 21-3-2.

It does. The South Dakota Legislature has explicitly made it an "obligation" to not wrongfully cause someone's death by authorizing a cause of action under SDCL § 21-5-1. And because this obligation arises from a legislative mandate rather than an agreement between two parties, this obligation does not arise from contract. Thus, SDCL § 21-3-2 unambiguously authorizes punitive damages for violations of SDCL § 21-5-1.

While SDCL § 21-5-7 explicitly provides pecuniary damages are available for wrongful death claims and simultaneously does not mention punitive damages, this section cannot be read in isolation. *LeFors*, 991 N.W.2d at 683; *Endres*, 984 N.W.2d at 152. Taking this section in context and giving meaning to all of the words of both this section and SDCL § 21-3-2, SDCL § 21-5-7 is best understood not as an exclusive recounting of the damages available under a wrongful death claim, but rather as a limitation on pecuniary damages: pecuniary damages must be "proportionate" to the pecuniary injury "resulting from such death to the persons respectively for whose benefit such action shall be brought." *See* SDCL § 21-5-7. Interpreting SDCL § 21-5-7 as a limit on

pecuniary damages rather than an exclusive list of available damages gives a reasonable interpretation and ensures SDCL §§ 21-5-7 and 21-3-2 harmoniously exist. *Jucht*, 821 N.W.2d 635. In fact, adopting defendants' interpretation would "inappropriate[ly] [] select [SDCL § 21-5-7] and disregard [SDCL § 21-3-2] which [] modif[ies] . . . the effective scope of [SDCL § 21-5-7]." *In re Expungement of Oliver*, 810 N.W.2d at 352.

The South Dakota Supreme Court has already taken this exact approach in *Groseth Int'l, Inc. v. Tenneco Inc.*, 440 N.W.2d 276, 279 (S.D. 1989) (*overruled on other grounds by Tibke v. McDougall*, 479 N.W.2d 898, 906-07 (S.D. 1992)). There, the Court confronted the issue of whether punitive damages were available for suits under SDCL § 37-5-4 (which provides a cause of action for car dealers to sue manufacturers, factories, branches, distributors, distributor-branches, or their agents for various unlawful actions).[15] *See id.* Crucially,

---

[15] SDCL § 37-5-4 provides: "Each and every person and corporation who or which violates any provision of §§ 37-5-1 to 37-5-3, inclusive, shall be liable to any dealer damaged thereby for all damages caused to such dealer by such violation."

SDCL § 37-5-1 provides:

> It is a Class 1 misdemeanor for any manufacturer, factory, branch, distributor, or distributor-branch, or any field representative, officer, agent, or representative of any of them to coerce or attempt to coerce any dealer to purchase or accept delivery of any merchandise, repair parts for the merchandise, or any other commodity that has not been ordered by the dealer; by threatening to cancel or terminate any franchise, agency, arrangement, or agreement existing between such manufacturer, factory, branch, distributor, distributor-branch, or any field representative, officer, agent, or representative of any of them and the dealer or by any other unfair means or by duress of any kind.

SDCL § 37-5-4 provided that in cases of a violation under SDCL §§ 37-5-1 to 37-5-3, inclusive, a wrongdoer shall be liable "for all damages caused to such dealer by such violation." SDCL § 37-5-4. Section 37-5-4 explicitly references the damages available as those which the dealer suffered and did not mention punitive or exemplary damages. *Id.* Observing SDCL § 37-5-4's silence and SDCL § 21-1-4's command that punitive damages are available only when expressly authorized by statute, the defendants in *Groseth* argued—just as defendants argue in this instant case—that punitive damages are necessarily unavailable under SDCL § 37-5-4.

---

SDCL § 37-5-2 provides:

> It is a Class 1 misdemeanor for any manufacturer, factory, branch, distributor, or distributor-branch, or any field representative, officer, agent, or representative of any of them to coerce or attempt to coerce any dealer to enter into any agreement with the manufacturer, factory, branch, distributor, or distributor-branch, or any field representative, officer, agent, or representative of any of them, or to assign, sell, or dispose of any contract or property in any way, or to expend any money or do any other act unfair to such dealer; by threatening to cancel or terminate any franchise, agency, arrangement, or agreement existing between such manufacturer, factory, branch, distributor, distributor-branch, or any field representative, officer, agent, or representative of any of them and the dealer or by any other unfair means or by duress of any kind.

SDCL § 37-5-3 provides:

> It is a Class 1 misdemeanor for any manufacturer, factory, branch, distributor, or distributor-branch, or any field representative, officer, agent, or representative of any of them, unfairly, without due regard to the equities of the dealer and without just provocation, to cancel the franchise of any dealer.

But the Supreme Court in *Groseth* rejected this argument. *Groseth* explained: "[o]ur analysis does not end by applying SDCL 21-1-4 to SDCL 37-5-4. *We also examine whether the provisions of SDCL 21-3-2 apply to this case.*" *Groseth*, 440 N.W.2d at 279 (emphasis added). Because the violation in *Groseth* "involve[d] the breach of a statute and thus meets the statutory limitation of 'breach of an obligation not arising from contract[,]" the Court held punitive damages may be available in suits filed under SDCL § 37-5-4. *Id.* The route *Groseth* took is the precise route this court must take. Just as SDCL § 21-3-2 authorizes punitive damages in claims filed under SDCL § 37-5-4, so too does SDCL § 21-3-2 authorize punitive damages in wrongful death suit claims brought under SDCL § 21-5-7.

The Supreme Court has taken this approach in other contexts as well, albeit less explicitly. For example, consider the South Dakota Legislature's statute authorizing a cause of action for deceit, which provides: "One who willfully deceives another, with intent to induce him to alter his position to his injury or risk, is liable for any damage *which he thereby suffers.*" SDCL § 20-10-1 (emphasis added). By specifically laying out that fraud victims may recover damages for "which [they] thereby suffer[]" and not mentioning punitive damages, it may seem like from its face, SDCL §§ 20-10-1 and 21-1-4 preclude punitive damages in deceit cases because punitive damages are not aimed at compensating a victim's suffering, but rather deterring and punishing wrongdoers. *Fluth*, 917 N.W.2d at 533. But the South Dakota Supreme Court in *Stabler v. First State Bank of Roscoe*, unambiguously held that SDCL § 21-3-

60

2 authorizes punitive damages in tortious deceit claims filed under SDCL § 20-10-1. 865 N.W.2d 466, 474, 474 n.12 (S.D. 2015) (explaining plaintiffs brought deceit claim under SDCL 20-10-1 at trial), 479-80 (upholding jury's punitive damages award based on SDCL § 21-3-2). The Court in *Stabler* could not have so held if it read SDCL § 20-10-1's authorization of damages for which the plaintiff suffers to necessarily exclude punitive damages from this cause of action. But *Stabler* makes clear that punitive damages are available in tortious deceit claims brought under SDCL § 20-10-1. So too with the wrongful death statute here.

The court recognizes that in both *Groseth* and *Stabler*, the statutes at issue included both the causes of action and the damages in the same section. *See Groseth*, 440 N.W.2d at 279; *Stabler*, 865 N.W.2d at 474-76. That is not the case with the wrongful death statute: the wrongful death statutes here both have a section that provides for the cause of action and a *separate* section that specifically provides for certain kinds of available damages. *See* SDCL §§ 21-5-1 (cause of action for wrongful death) and 21-5-7 (damages for wrongful death). Thus, one may argue that this case is distinguishable from *Groseth* and *Stabler* because the South Dakota Legislature's decision to provide for a separate section for damages in SDCL § 21-5-7 is more indicative that the Legislature intended to make such damages the exclusive kinds of damages available under a wrongful death claim, compared to the Legislature's decisions in the statutes involved in *Groseteh* and *Stabler*.

But the South Dakota Supreme Court's decision in *Till v. Bennett*, 281 N.W.2d 276, 279 (S.D. 1979) directly forecloses this analysis. In *Till*, the cause of action involved was a trespass violation by livestock. *See id.* at 278; SDCL § 40-28-4. SDCL § 40-28-4 provides in relevant part that a person who owns, has charge of, or is in possession of, certain livestock and such livestock trespasses on another's land, "is liable to any such person injured for all damages sustained by reason of the trespass." SDCL § 40-28-4. Again, SDCL § 40-28-4 says nothing about punitive damages. And on its face it suggests that a wrongdoer is liable only for damages sustained *by reason of the trespass*, which is wholly separate from the purpose for which punitive damages exist. *See Fluth*, 917 N.W.2d at 533.

In fact, just like the statutory scheme with respect to the wrongful death statute, the South Dakota Legislature explicitly provided a separate section for damages for trespass by livestock cases. *Compare*, SDCL §§ 21-5-1 (cause of action for wrongful death) and 21-5-7 (damages for wrongful death), *with* SDCL §§ 40-28-4 (cause of action for trespass by livestock) and 40-28-23 (damages for trespass by livestock). The damages statute for trespass by livestock provides: "Upon the trial of an action under the provisions of this chapter, the plaintiff shall recover the amount of damages sustained and the expenses of keeping the trespassing animal or animals during the time he has restrained and retained the custody thereof." SDCL § 40-28-23. Just as in § 21-5-7 (the damages section for wrongful death claims), nothing in SDCL § 40-28-23 says anything about punitive damages.

Putting together SDCL §§ 40-28-4 and 40-28-23, the South Dakota Legislature in both sections explicitly discussed the available damages and did not mention punitive damages. If there was ever a circumstance in which the Legislature meant to exclude punitive damages, it would be with this trespass by livestock cause of action.

But not so, says *Till*. Instead, *Till* affirmed a jury's award of punitive damages for a violation of § 40-28-4 because SDCL § 21-3-2 plainly applied. 281 N.W.2d at 279; *see also Risse v. Meeks*, 585 N.W.2d 875, 877 (S.D. 1998) ("This Court has specifically found [that punitive damages statute in SDCL § 21-3-2] applies to causes of action brought pursuant to SDCL 40-28-4."). It did not matter that SDCL §§ 40-28-4 and 40-28-23 provided for certain kinds of damages for trespass by livestock actions without saying anything about punitive damages. *See Till*, 281 N.W.2d at 279. Those statutes did not displace the punitive damages statute in SDCL § 21-3-2, which plainly applied.

*Groseth*, *Stabler*, and *Till* teach three related and dispositive lessons. First, in determining whether a cause of action authorizes punitive damages, courts must look not only at the damages expressly provided for in the specific cause of action statute, but also to the punitive damages statute set forth in SDCL § 21-3-2. *See Groseth*, 440 N.W.2d at 279; *Stabler*, 865 N.W.2d at 474-76, 479-80. Second, the mere inclusion of a specific kind of damages in the specific cause of action (without explicitly mentioning punitive damages) poses no barrier to the availability of punitive damages, so long as the requirements under SDCL § 21-3-2 are satisfied. *See Groseth*, 440 N.W.2d at 279; *Stabler*,

63

865 N.W.2d at 474-76, 479-80. If it were not for these two lessons, neither the claim under SDCL § 37-5-4 nor the deceit claim under SDCL § 20-10-1 would have allowed punitive damages because both SDCL § 37-5-4 and SDCL § 20-10-1 were silent on punitive damages (in fact expressly provided for a different kinds of damages). *See* SDCL §§ 37-5-4; 20-10-1. But the South Dakota Supreme Court has held that both causes of action authorize punitive damages under SDCL § 21-3-2. *See Groseth*, 440 N.W.2d at 279; *Stabler*, 865 N.W.2d at 474-76, 479-80.

Third, not only is the inclusion of non-punitive damages in the statute that recognizes the cause of action insufficient to show the unavailability of punitive damages for such action, but the inclusion of non-punitive damages *in the damages section of the statute that recognizes a cause of action* is similarly insufficient. *See Till*, 281 N.W.2d at 279; *Risse*, 585 N.W.2d at 877. In other words, *Till* illustrates the mere fact that SDCL § 21-5-7 provides an explanation regarding pecuniary damages without mentioning punitive damages does not necessarily exclude punitive damages. Instead, the key inquiry is whether, taken as a whole, any of the statutes expressly authorize punitive damages. *See* SDCL § 21-1-4.

Appling the holdings of *Groseth*, *Stabler*, and *Till* to the plain language of the statutes at issue, this court must also look at SDCL §§ 21-1-4, 21-5-1, and 21-5-7, and also SDCL § 21-3-2. Because a violation of the wrongful death statute is necessarily a violation of an "obligation" not arising from contract, the plain language of SDCL § 21-3-2 authorizes punitive damages. As a result,

64

the court predicts that the South Dakota Supreme Court would hold that SDCL § 21-3-2 authorizes punitive damages for wrongful death claims brought under SDCL § 21-5-1.

Having lost on the text, defendants instead focus on the South Dakota Supreme Court's decision in *Smith v. Chicago, M & St. P Ry. Co.*, 62 N.W. 967, 968 (S.D. 1895), which determined that punitive damages were unavailable in a previous version of the wrongful death statute (passed in 1887) and urges the court to hold the same under the current statute. *See* Docket 39 at 20; Docket 66 at 6-8. In *Smith*, the Court noted that in the version before 1887, the statute allowed individuals to recover "punitive damages for the loss[.]" *Smith*, 62 N.W. at 968. The legislature, however, struck the word "punitive" and provided that individuals could recover "damages." *See id.* The Court observed that this deletion "is an important fact, as showing the intention of the legislature to change the rule allowing a recovery for 'punitive,' exemplary, or vindictive damages, and to limit parties to recovery for actual or compensatory damages only." *Id.*

But whatever the merits of *Smith*'s decision on the availability of punitive damages at the time,[16] the South Dakota Legislature has amended the 1887

---

[16] Plaintiff invites this court to revisit *Smith*'s decision by introducing additional evidence of the legislature's intent at the time it struck the word "punitive" from the statute providing for damages under wrongful death suits. *See* Docket 47 at 19-27; Docket 58 at 8-21. But for reasons explained above, the court finds it unnecessary to dive into the previous legislative record based on the plain text of SDCL §§ 21-1-4, 21-5-1, 21-5-7, and 21-3-2. Relatedly, plaintiff requests the court take judicial notice of various items, including the 1877 and 1887 versions of Dakota Territory laws relating to wrongful death actions and

version of the statute multiple times and thus *Smith*'s holding does not bind

the court. *See Anderson v. Lale*, 216 N.W.2d 152, 155 (S.D. 1974) (recounting

the history of the wrongful death statute). Importantly, the Supreme Court in

*Anderson* expressly stated that in interpreting a current version of a statute,

the Court is *not* bound by its previous decisions on previous versions of the

statute, even if the wording of such versions is identical to the current version.

*See id.* at 155-56. In *Anderson*, for example, the court confronted the issue of

whether a plaintiff could recover for loss of companionship and association

under the statute's allowance of "pecuniary damages." *See id.* at 154-55.

In deciding this issue, the court traced the history of the wrongful death

statute. In 1909, after the decision in *Smith*, the Legislature codified the term

"pecuniary injury," and the wrongful death statute remained unchanged until

1947. *See Anderson*, 216 N.W.2d at 155. Prior to the 1947 change, the

Supreme Court at first held in *Rowe v. Richards*, 142 N.W. 664, 666 (S.D.

1913), that in a wrongful death action, a plaintiff could recover for loss of

means of support, loss of society, comfort, and care suffered by the plaintiff in

---

punitive damages, as well as newspaper articles printed during this time
period. *See* Docket 55. Defendants do not object to the court taking judicial
notice of the 1877 and 1887 versions of the statutes. *See* Docket 65 at 1-2; *see
also McIndoo v. Burnett*, 494 F.2d 1311, 1313 (8th Cir. 1974) (explaining "the
law of any state of the Union, whether depending upon statutes or upon
judicial opinions, is a matter of which the courts of the United States are
bound to take judicial notice, without plea or proof"). The court thus takes
judicial notice of these previous versions of the statutes. With respect to the
newspapers, however, defendants object for various reasons. *See* Docket 65 at
2. The court does not rely in any way on the contents of these newspapers in
reaching its decision, so the court denies plaintiff's request to take judicial
notice of these newspaper articles as moot.

the death of the decedent. But then in a series of four decisions, the Court narrowed the scope of recoverable pecuniary damages, holding that the wrongful death statute only allowed for expenses necessarily incurred and a reasonable expectation of benefit which would have resulted from the continued life of the deceased. *See Anderson*, 216 N.W.2d at 155 (citing *Smith v. Presentation Acad. of Aberdeen*, 248 N.W. 762 (S.D. 1933); *Tufty v. Sioux Transit Co.*, 10 N.W.2d 767 (S.D. 1943); *Hodkinson v. Parker*, 16 N.W.2d 924 (S.D. 1944); and *McCleod v. Tri-State Milling Co.*, 24 N.W.2d 485 (S.D. 1946)).

Following these decisions, in 1947, the South Dakota Legislature removed the word "pecuniary" and instead inserted the word "all" in its place, "thus enlarging the measure of damages which could be recovered." *See id.* (citing Ch. 173, s 1, S.L. 1947). After this statutory change, the South Dakota Supreme Court expanded the scope of pecuniary damages, holding that "[t]he mental anguish and the loss of companionship susceptible of monetary valuation were . . . proper elements to be considered in estimating the damages sustained by the parents." *Id.* (quoting *Simons v. Kidd*, 42 N.W.2d 307, 310 (S.D. 1950)).

Then in 1967, the South Dakota Legislature passed a new statute, changing the term "all injury" back to "pecuniary injury." *See id.* The defendants in *Anderson* argued the trial court erroneously instructed the jury that "pecuniary loss" included the loss suffered from being deprived of advice, comfort, and protection of the child. *See id.* at 154-56. In support, the defendants argued the Court should interpret the current statute—which

67

authorized "pecuniary damages"—the same way the Court had interpreted an identical earlier version when it too only authorized "pecuniary damages." *See id.* at 155-56. Thus, according to the defendants, "it was the intention of the legislature in making the 1967 changes to return to the more restrictive measure of damages in wrongful death actions of prior times." *Id.* at 155.

But the Supreme Court in *Anderson* explicitly rejected the defendants' argument, stating that it "d[id] not feel constrained to follow our past decisions." *Id.* at 156. Instead, the Court explained that "the wrongful death statute is remedial in character and, therefore, should be construed liberally in light of current social conditions." *Id.* at 155-56. After considering other state's decisions, the Court held that the wrongful death statute allowed for pecuniary loss "includ[ing] loss of companionship, society, advice, assistance and protection" where the decedent was a minor. *Id.* at 158.

While *Anderson* did not discuss the precise issue in this case—namely, whether the wrongful death statute authorizes punitive damages—it teaches an important lesson. The mere fact that the Supreme Court had once interpreted an identically worded statute (that had then subsequently been amended and then re-adopted) to disallow one type of damages does not automatically mean the Supreme Court will do the same with a newly amended statute. *See id.* at 155-56. Thus, the court predicts that the South Dakota Supreme Court would not feel bound by *Smith*'s interpretation—of a previous version of the wrongful death statute—that excluded punitive damages. That's especially the case here,

where the text of the statutes at issue unambiguously authorizes punitive damages as discussed above.

Finally, the court acknowledges that *Smith*'s holding regarding the unavailability of punitive damages may be relevant for a related reason: the South Dakota Legislature did not change the wrongful death statute to explicitly provide for punitive damages, even though it could have and even though it changed the wrongful death statute in response to the Supreme Court's interpretations several times as outlined above. *See Anderson*, 216 N.W.2d at 155 (walking through various versions and the legislature's various responses to the Supreme Court's decisions). Thus, the South Dakota Legislature's failure to clarify the availability of punitive damages despite *Smith*'s contrary holding, given this court "presume[s] the Legislature acts with knowledge of [the Court's] judicial decisions[,]" "suggests that the Legislature agrees with [*Smith*'s] interpretation." *See AEG Processing Ctr. No. 58, Inc., v. S. D. Dep't. of Revenue and Regul.*, 838 N.W.2d 843, 848 (S.D. 2013). But this presumption is just a presumption, and it must yield to the plain and unambiguous language of the statutes. *See Whalen v. Whalen*, 490 N.W.2d 276, 281 n. 2 (S.D. 1992). For the reasons explained above, the court finds that SDCL §§ 21-1-4, 21-5-1, 21-5-7, and 21-3-2, collectively interpreted, unambiguously authorize punitive damages in wrongful death claims, and predicts the South Dakota Supreme Court would do the same.

The court also acknowledges that two previous federal courts, including this court back in 2006, predicted that South Dakota does not authorize

punitive damages in wrongful death claims. *See Sheesley*, 2006 WL 1084103, at *27; *Bethel*, 597 F. Supp. at 58-59. But neither of these decisions bind the court, nor did either of them discuss the interplay between SDCL §§ 21-1-4, 21-5-1, 21-5-7, 21-3-2, and the Supreme Court decisions in *Groseth*, *Stabler*, and *Till*. After carefully considering the new arguments presented today, the court finds it appropriate to change its mind from *Sheesley* and respectfully disagree with *Bethel*.

In short, South Dakota law authorizes punitive damages for wrongful death claims. Of course, this finding says nothing about whether plaintiff will ultimately succeed and secure them. Just like any other claim for punitive damages, plaintiff must show that VanIperen acted with malice as required under SDCL § 21-3-2. *See Smizer v. Drey*, 873 N.W.2d 697, 703 (S.D. 2016) (citation omitted). In moving for summary judgment, defendants only argue that South Dakota law does not authorize punitive damages. *See* Docket 39 at 19-21; Docket 60 at 21-23. Defendants do not argue that VanIperen's actions, viewed in the light most favorable to plaintiff, are insufficient to show malice. *See* Docket 39 at 19; Docket 60 at 21-23. Thus, based on defendants' arguments, the court denies defendants' motion for summary judgment on the issue of punitive damages. [17]

---

[17] As mentioned at the beginning of this order, plaintiff also moves to supplement the evidentiary record, including portions of VanIperen's deposition testimony, Harms Oil employee Travis Manke, Harm Oil's safety manager DuWayne Aman, other witnesses, discovery requests to defendants for which responses are pending, and "other relevant evidence obtained following the close of briefing on [d]efendants' motion for summary judgment." Docket 79 at

**CONCLUSION**

Based on the above, it is ORDERED that:

(1) Plaintiff's partial motion for summary judgment is GRANTED IN
PART AND DENIED IN PART. The court grants summary
judgment in favor of plaintiff on defendant's assumption of the
risk defense. The court denies summary judgment on the issue
of contributory negligence.

(2) Defendants' motion for summary judgment is GRANTED IN
PART AND DENIED IN PART. The court grants summary
judgment in favor of defendants on plaintiff's survival claim.
The court denies summary judgment on all other claims.

(3) Defendants' motion to strike (Docket 67) is DENIED as moot.

(4) Plaintiff's request for judicial notice (Docket 55) is GRANTED IN
PART AND DENIED IN PART. The court takes judicial notice of
the previous 1877 and 1887 versions of the wrongful death
statutes in South Dakota. The court does not take judicial
notice of the various newspaper articles because, even if it is
proper, it is unnecessary.

---

1-2. This evidence does not appear relevant to plaintiff's survival claim on the
issue of whether Kelley died instantaneously, which is the only claim on which
the court granted summary judgment in favor of defendants. Rather, this
proposed evidence appears relevant for the issues of contributory negligence,
assumption of the risk, and punitive damages for plaintiff's wrongful death
claim. Because the court denies defendants' summary judgment motion on the
issues of contributory negligence, assumption of the risk, and punitive
damages in plaintiff's wrongful death claim, the court denies plaintiff's motion
to supplement the evidentiary record (Docket 79) as moot.

(5) Plaintiff's request to certify (Docket 57) the issue of whether punitive damages is available under wrongful death suits is DENIED; and

(6) Defendants' motion for oral argument (Docket 62) is DENIED.

(7) Plaintiff's motion to supplement the evidentiary record (Docket 79) is DENIED as moot.

Dated June 4, 2024.

BY THE COURT:

/s/ *Karen E. Schreier*
KAREN E. SCHREIER
UNITED STATES DISTRICT JUDGE